IN RE: MARY ALBERTA HATLEY

No. 142

(Filed 31 January 1977)

1. Appeal and Error § 9; Insane Persons § 1— commitment to mental institution — discharge of patient — appeal

Appeal from an involuntary commitment order was not rendered moot by the expiration of the 90-day commitment order under which respondent was institutionalized, since such commitment might form the basis for a future commitment, and other collateral legal consequences may result from the determination that respondent was mentally ill.

2. Insane Persons § 1— involuntary commitment — imminent danger to self or others — insufficiency of evidence

Trial court's finding that respondent was imminently dangerous to herself and others was not supported by clear, cogent and convincing evidence where respondent's mother testified only that respondent had previously been confined to mental institutions because of nervous breakdowns, that respondent went into a neighbor's house while the neighbor was not at home, that respondent backed her car too fast and didn't look over her shoulder like she should, and that she signed an affidavit that respondent threatened a relative with a brick but she had no firsthand knowledge of the incident, and where a medical report admitted in evidence was based upon the facts testified to by respondent's mother rather than upon facts discovered by the physician's examination and an application of his training and experience.

APPEAL from the decision of the Court of Appeals, *Morris, J.*, dissenting, 30 N.C. App. 413, 227 S.E. 2d 144, affirming the judgment of *Paschal, J.*, at the 4 August 1975 Session of ORANGE County District Court.

On 25 July 1975 Mrs. Etta Couch initiated proceedings for the involuntary commitment of her daughter, Mary Alberta Hatley, pursuant to Ch. 122, Article 5A, of the North Carolina General Statutes. She alleged in her petition that her daughter,

the respondent, was mentally ill and imminently dangerous to herself or others. On the basis of this petition, a magistrate ordered that respondent be taken into custody in order that she might be examined by a qualified physician.

Respondent was then examined by Dr. Tom Wilson at North Carolina Memorial Hospital in Chapel Hill. Dr. Wilson determined that respondent was mentally ill and imminently dangerous to herself or others.

Respondent was then transferred to John Umstead Hospital where she was examined by Dr. Mohammed Elmaghraby, who also found respondent to be mentally ill and imminently dangerous to herself or others.

On 4 August 1975 a hearing was held in the District Court pursuant to G.S. 122-58.7, to determine whether respondent should be committed for further treatment. At the conclusion of the hearing, the trial judge ordered that respondent be committed to John Umstead Hospital for a period not to exceed 90 days.

The sworn testimony at the hearing in District Court and the medical report of Dr. Tom Wilson will be more fully considered in the opinion.

*Attorney General Edmisten, by Isaac T. Avery III, for the State.*

*Jerry P. Davenport for respondent appellant.*

BRANCH, Justice.

[1]  We initially consider the State's contention that this appeal is moot in light of the fact that the 90-day commitment order under which respondent was institutionalized has expired.

When events occur during the pendency of an appeal which cause the underlying controversy to cease to exist, this Court properly refuses to entertain the cause merely to adjudicate abstract propositions of law. *Parent-Teacher Assoc. v. Bd. of Education,* 275 N.C. 675, 170 S.E. 2d 473. However, even when the terms of the judgment below have been fully carried out, if collateral legal consequences of an adverse nature can reasonably be expected to result therefrom, then the issue is not moot and the appeal has continued legal significance. *Sibron v. New York,* 392 U.S. 40, 20 L.Ed. 2d 917, 88 S.Ct. 1889.

The question of whether an appeal from an involuntary commitment order is rendered moot by the discharge of the patient was considered in the case of *In re Ballay,* 482 F. 2d 648. There the Court of Appeals for the District of Columbia stated:

> There is yet another independent reason why the present appeal is not moot—the collateral consequences of being adjudged mentally ill remain to plague appellant. We recently had occasion to consider whether the standard applied in criminal cases, that a "case is moot only if it is shown that there is *no possibility* that any collateral legal consequence will be imposed on the basis of the challenged conviction," *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed. 2d 917 (1968) (emphasis added), is applicable to contested civil commitment adjudications. We answered in the affirmative relying upon the multitude of legal disabilities radiating from the label "mentally incompetent." . . .

> \*　　\*　　\*

> . . . Indeed, such an adjudication, while not always crippling, is certainly always an ominous presence in any interaction between the individual and the legal system. Such evidence will frequently be revived to attack the capacity of a trial witness. Depending upon the diagnosis, it may be admissible for impeachment purposes. Indeed, even in a criminal trial it may be available to attack the character of a defendant if he has put character in issue. Most significantly, records of commitments to a mental institution will certainly be used in any subsequent proceedings for civil commitment, a factor which may well have been influential in the present case.

*Accord: In re Sciara,* 21 Ill. App. 3d 889, 316 N.E. 2d 153.

As previously noted, Judge Paschal based his commitment order, in part at least, upon a finding that respondent had a history of prior commitments. The possibility that respondent's commitment in this case might likewise form the basis for a future commitment, along with other obvious collateral legal consequences, convinces us that this appeal is not moot. We, therefore, proceed to consider this case on its merits.

The General Assembly declared its policy as to involuntary commitment of the mentally deranged in the following lan-

guage: "It is the policy of the State that no person shall be committed to a mental health facility unless he is mentally ill or an inebriate and imminenty dangerous to himself or others; . . . . " G.S. 122-58.1.

G.S. 122-58.7(i), in part, provides: "To support a commitment order, the court is required to find, by clear, cogent, and convincing evidence, that the respondent is mentally ill or inebriate, and imminently dangerous to himself or others. The court shall record the facts which support its findings." Our legislative statement of public policy and the statutory requirements found in Article 5A of Ch. 122 of the North Carolina General Statutes are consistent with the recent case of *O'Connor v. Donaldson*, 422 U.S. 563, 45 L.Ed. 2d 396, 95 S.Ct. 2486, which, *inter alia*, holds that there is no constitutional basis for the involuntary confinement of an individual who is mentally ill if he is dangerous to no one and can live safely in freedom. *See also People v. Sansone*, 18 Ill. App. 3d 315, 309 N.E. 2d 733.

[2] The only witness to appear at the commitment hearing in District Court was Mrs. Etta Couch, the mother and neighbor of respondent. Mrs. Couch testified that respondent had been confined to mental institutions in 1972, 1973 and 1974 because of "nervous breakdowns." She testified that Mrs. Hatley went into the house of a neighbor, Mrs. McPherson, while Mrs. McPherson was not there. On cross-examination the witness stated that she did not "know firsthand whether Mrs. McPherson was actually in the house or not." The evidence shows nothing inconsistent with a neighborly visit except that someone called a deputy sheriff who found respondent in the neighbor's home. The witness also stated that she signed an affidavit that respondent threatened a relative with a brick, but that she did not see the incident and "had no firsthand knowledge" of this incident. She testified that there were times when, in her opinion, Mrs. Hatley should not be driving because "when she was backing up, she wouldn't look over her shoulder like she should or make the proper sign. She would also back up too fast." However, Mrs. Couch qualified this statement with the following language:

> No, she did not almost have an accident at any time that I can recall. No, she does not drink and drive. No, when I was in the car with her the car never left the road. No, I never saw her run through a stop sign or violate a

stoplight. No, she never came close to injuring a pedestrian. Yes, she seldom drives. She has driven more lately than she did in prior years. I think she could have an accident however, but for the past month she hasn't been driving too much.

The court accepted into evidence the medical report of Dr. Tom Wilson which was at follows:

Next of kin or other responsible person:

Parne Hatley
Rt. 6 Box 472
Chapel Hill, N. C. 27514

On 7-25-75, at 3:30 a.m. o'clock, I examined the above-named person in AT NCMH EMERGENCY ROOM, with the following findings:

*Indications for Mental Illness or Inebriacy:*

Erratic behavior that has included: (1) threatening a relative yesterday with a brickbat without provication (sic), (2) reportedly careless and reckless driving of her motor vehicle, (3) receiving money from church for "food for poor persons" which she used to buy cases of goods at local food store for which she had no purpose (case of weiners, chicken, etc.) has become increasing hostile and aggressive toward relatives, (4) ran away from home yesterday and deputy sheriff had to be called to find her in a neighbor's house.

*Indications for Imminent Danger to Self or Others:*

Threatened another person with brick, erratic behavior such that she is unable to comprehend her actions, erratic driving habits which have developed along with other symptoms.

*Abnormal Physical Condition Noted, Including Any Pertinent History:* None

*Current Medications: None*—given 100 mg. Thorazine in E.R.

*Tentative Diagnosis:* psychotic behavior—prob. paranoid schizophrenia

As a result of the examination, it is my opinion that the named person:

IS Mentally Ill or Inebriate, and Imminently Dangerous to Himself or Others:

> s/ TOM WILSON M.D.
> Qualified Physician
> NCMH
> Chapel Hill, N. C. 27514

(Sworn to 4:00 o'clock on this
25 day of July, 1975.)

We note that the record discloses an undated, unsworn medical report signed by Dr. Mohammed Elmaghraby which might have furnished evidence to support the trial judge's findings since it appears to be based solely upon the observation and examination of a qualified physician. However, the judgment in this cause discloses that the trial judge relied solely upon the testimony of the sworn witness and the sworn medical report of Dr. Tom Wilson.

At the conclusion of the hearing Judge Paschal entered the following pertinent findings:

> 6. That the Court further heard evidence of Mrs. Couch and finds that the respondent is mentally ill because (a) she has a history of mental and emotional distress and has been committed to a hospital on several occasions in the past; (b) she was driving in a careless and reckless manner such that the lives of persons with whom she came in contact might or could be endangered; (c) she entered a house at a time when that house was not physically present by that neighbor who usually occupied the house;

> 7. That based on the evidence the Court finds that the respondent is imminently dangerous to herself in that she was driving in a careless and reckless manner such that the lives of persons with whom she came in contact might or could be endangered and in that she entered a house at a time when that house was not physically present by that neighbor who usually occupied the house;

He then ordered that respondent be committed to John Umstead Hospital for a period not to exceed 90 days.

Although a stricter degree of proof may be required in those cases requiring clear and convincing evidence, the terms "clear" and "convincing" are "not susceptible of separate, analytical comparison with greater weight of the evidence." *McCorkle v. Beatty*, 225 N.C. 178, 33 S.E. 2d 753. It is for the trier of fact to determine whether evidence offered in a particular case is clear and convincing. 2 Stansbury's N. C. Evidence (Brandis Rev. 1973) § 213, p. 162.

We find nothing in the testimony of the witness, Mrs. Couch, which would even support a reasonable inference that Mrs. Hatley was imminently dangerous to herself or others.

We now turn to the medical evidence. G.S. 122-58.4, in part, provides: "The findings of the qualified physcian and the facts on which they are based, shall be in writing, in all cases." Dr. Wilson's compliance with the mandate of the statute makes it readily apparent that the findings denominated "Indications" in the form medical report are based upon the very same facts testified to by Mrs. Couch in the District Court rather than upon facts discovered by Dr. Wilson's examination and an application of his training and experience. The insertion of these same facts in a medical report does not give them greater force or dignity than the sworn testimony presented in the District Court. There is nothing to indicate that the findings or "Indications" contained in this report were based on a medical examination by Dr. Wilson or upon his experience or study as a qualified psychiatrist.

We wish to make it absolutely clear that we do not intend to restrict or change the existing rules of evidence. We simply hold that the finding in this case that respondent was imminently dangerous to herself and others is not supported by clear, cogent and convincing evidence.

For the reasons stated, the decision of the Court of Appeals is

Reversed.