# IN THE SUPREME COURT OF IOWA

No. 12–0158

Filed January 4, 2013

**IN THE MATTER OF B.B.,** Alleged to be
Seriously Mentally Impaired,

**B.B.,**

    Appellant.

---

Appeal from the Iowa District Court for Woodbury County, John D. Ackerman, Judge.

An appellant appeals a district court order finding him "seriously mentally impaired." **AFFIRMED.**

Zachary S. Hindman of Bikakis, Mayne, Arneson, Hindman & Hisey, Sioux City, for appellant.

Thomas J. Miller, Attorney General, Gretchen Witte Kraemer, Assistant Attorney General, Patrick A. Jennings, County Attorney, and Joshua D. Widman, Assistant County Attorney, for appellee.

**APPEL, Justice.**

In this case, we must determine whether an appeal from a finding of "serious mental impairment" resulting in an involuntary commitment under Iowa Code chapter 229 (2011) becomes moot when the appellant is released and the proceedings are terminated. We agree with the jurisdictions that hold such an appeal is not moot. On the merits presented, we conclude substantial evidence supports the conclusion of the district court that the appellant was "seriously mentally impaired." We therefore affirm the judgment of the district court.

## I. Factual and Procedural Background.

On December 14, 2011, police brought B.B. to the emergency room at Mercy Medical Center in Sioux City after he entered a restricted area at an Iowa Air National Guard base. A judge then ordered B.B.'s emergency hospitalization pursuant to Iowa Code section 229.22(3). The judge found probable cause to believe B.B. was "seriously mentally impaired" and "a threat to harm himself or others" because B.B. was in a very agitated and confused state when police brought him to the hospital, was "making wild threats to harm himself and others," and required "[three] police officers to keep him subdued."

Shortly after B.B.'s emergency hospitalization, an application alleging serious mental impairment pursuant to Iowa Code section 229.6 was filed with the District Court for Woodbury County. Two affidavits accompanied the application. The first affidavit, made by Marlene Sorensen, stated B.B. attempted to board a plane in Omaha, Nebraska, with a fake passport. It further indicated that B.B. then drove to Sioux City, Iowa, and tried to follow a worker into a secured area at the air base in Sergeant Bluff. The affidavit further stated B.B. was paranoid when authorities brought him into the hospital. A second affidavit, filed by

Jane Hoffman, was substantially the same, except it stated that B.B. attempted to board the plane with a fake boarding pass instead of a fake passport and also stated B.B.'s wife "fears that he might harm her or their children if released" from the hospital.

A physician's report was also attached to the application. The report, authored by Dr. Ejiro Idahosa, a psychiatrist, diagnosed B.B. with psychosis, not otherwise specified, and noted symptoms of paranoia. Dr. Idahosa concluded B.B. lacked sufficient judgment to make responsible decisions with respect to his hospitalization or treatment because of the mental illness. The report further stated that, because of his mental illness, if left at liberty without treatment B.B. was more likely to physically injure himself or others, to inflict serious emotional injury on members of his family or others who lacked a reasonable opportunity to avoid contact with him, and to be unable to satisfy his need for nourishment, clothing, essential medical care, or shelter such that it made it likely he would suffer physical injury, debilitation, or death. Dr. Idahosa also noted B.B. had a history of mental illness, recommended B.B. return to inpatient treatment for further stabilization, and opined B.B. would need outpatient treatment upon release for medication management and therapy.

A hearing was held on the application on December 20. The Sorensen and Hoffman affidavits and Dr. Idahosa's report were admitted into evidence. Dr. Idahosa testified that B.B. met the statutory requirements as one who is seriously mentally impaired. She explained B.B. was a danger to himself or others based on B.B.'s irritability, arguments with his wife, and symptoms of paranoia. Elaborating, she stated that B.B. "feels people are trying to do something to him," that he believes people are trying to remove his brain or other organs from his

body, and that his wife "is afraid for him to come home." Dr. Idahosa further stated that "[B.B.'s wife] has a restraining order and he has nowhere to go." Dr. Idahosa noted the observations made in the two affidavits in the application. She testified that B.B.'s wife advised her B.B. had a history of paranoia that had been ongoing for twelve years and that recently the symptoms were "the worst [B.B.'s wife] has seen." Dr. Idahosa also opined B.B. did not have sufficient judgment to make responsible decisions with regard to his hospitalization or treatment. In Dr. Idahosa's opinion, hospitalization was the least restrictive form of treatment available for B.B. at that time.

B.B. also testified. B.B. denied attempting to board a flight with a fake passport. B.B. asserted it was all a misunderstanding because he found some boarding passes that did not belong to him and he was simply attempting to give them to an airline employee. He then left the Omaha airport and drove to the air base in Sergeant Bluff because he was emotional due to marital problems and "was considering getting into the National Guard." B.B. testified that he accidentally drove into a secured area. He further stated he did not believe he suffered from a mental illness or was a danger to himself or others.

The district court concluded the record established by clear and convincing evidence that B.B. was seriously mentally impaired. The court based its decision on the report and testimony of Dr. Idahosa, which it found credible; admissions made by B.B.; and the Sorensen and Hoffman affidavits. The court also concluded that B.B. lacked sufficient judgment to make responsible decisions regarding his hospitalization and treatment, illustrated by his failure to recognize that he had a mental illness, and that B.B. was likely to inflict serious injury to himself or others if he was not hospitalized. The court stated B.B.'s testimony

"just does not make sense on a great part of it" and that his testimony about his trips to the airport and air base was not credible. The court entered its order that day. B.B. appealed, alleging the district court's finding that B.B. was seriously mentally impaired was not supported by substantial evidence.

During the pendency of the appeal, B.B. was released to outpatient treatment at the University of Nebraska Medical Center (UNMC) in Omaha. Because an entry in the court file indicated B.B. was no longer a patient at UNMC as of January 28, 2012, and because B.B. did not have family or employment connections in Woodbury County, the State filed a motion to discharge and terminate the proceedings. The district court granted the motion, terminated the proceedings, discharged B.B. from court-ordered treatment and placement, and stated interested parties could reinitiate court proceedings if B.B. returned to Iowa and was believed to be seriously mentally impaired.

This proceeding is not B.B.'s first involuntary commitment proceeding. He testified that he was involuntarily committed approximately fourteen years ago for depression with psychotic features.

## II. Standard of Review.

We review challenges to the sufficiency of the evidence in involuntary commitment proceedings for errors at law. *In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998). The allegations made in an application for involuntary commitment must be proven by clear and convincing evidence. *Id.* Clear and convincing evidence is less burdensome than evidence establishing proof beyond a reasonable doubt, but more burdensome than a preponderance of the evidence. *Id.* "It means that there must be no serious or substantial doubt about the correctness of a

particular conclusion drawn from the evidence." *Id.* (citation and internal quotation marks omitted).

### III. Discussion.

We are confronted with two issues in this appeal. First, we must address whether an appeal from a finding that a person is seriously mentally impaired under chapter 229 becomes moot when the person is released from involuntary commitment and the proceedings are terminated.[1] Second, if the matter is not moot, we must determine whether the district court's finding that B.B. is seriously mentally impaired is supported by substantial evidence.

**A. Mootness.** Ordinarily, an appeal is moot if the "issue becomes nonexistent or academic and, consequently, no longer involves a justiciable controversy." *State v. Hernandez-Lopez,* 639 N.W.2d 226, 234 (Iowa 2002). We will generally not review moot issues, but our caselaw and that of other jurisdictions recognize exceptions. Relevant to this appeal, one exception permits appellate review of otherwise moot issues when the issue is one of broad public importance likely to recur. *Id.*; *In re M.T.*, 625 N.W.2d 702, 704 (Iowa 2001). Another exception provides that an appeal is not moot if a judgment left standing will cause the appellant to suffer continuing adverse collateral consequences. *See Sibron v. New York,* 392 U.S. 40, 53–57, 88 S. Ct. 1889, 1898–1900, 20 L. Ed. 2d 917, 929–31 (1968).

For example, in *M.T.* we stated that an appeal from an involuntary commitment was moot when the party had been released from inpatient treatment, the State no longer sought to have the party committed for

---

[1]For a discussion of the history of involuntary commitment under chapter 229, see Note, *Involuntary Hospitalization of the Mentally Ill in Iowa: The Failure of the 1975 Legislation*, 64 Iowa L. Rev. 1284 (1979).

inpatient treatment, and the party did not challenge his commitment to outpatient treatment. 625 N.W.2d at 705. Nonetheless, we reached the merits of whether the party's statutory right to be present at his involuntary commitment proceeding had been violated because it was an issue of broad public importance capable of recurring, yet likely to evade appellate review. *Id.*

Similarly, B.B.'s case is arguably moot because he was no longer subject to inpatient treatment and had been discharged from court-ordered treatment and placement. B.B., however, argues his case warrants our review because he will continue to suffer adverse collateral consequences.[2] Although we have not yet adopted this exception to the mootness doctrine in this context, we now hold that a party who has been adjudicated seriously mentally impaired and involuntarily committed is presumed to suffer collateral consequences justifying appellate review.

A number of jurisdictions recognize the notion that one who is involuntarily committed due to a mental illness suffers collateral consequences. *See, e.g.*, *In re Ballay*, 482 F.2d 648, 651–52 (D.C. Cir. 1973); *In re Joan K.*, 273 P.3d 594, 597–98 (Alaska 2012); *In re Morris*, 482 A.2d 369, 371–72 (D.C. 1984); *Bradshaw v. State*, 816 P.2d 986, 989 (Idaho 1991); *In re McCaskill*, 603 N.W.2d 326, 329 (Minn. 1999); *In re Splett*, 572 N.E.2d 883, 885 (Ill. 1991); *In re Walter R.*, 850 A.2d 346, 349–50 (Me. 2004); *In re Hatley*, 231 S.E.2d 633, 634–35 (N.C. 1977); *In re D.B.W.*, 616 P.2d 1149, 1150–51 (Okla. 1980); *State v. Lodge*, 608 S.W.2d 910, 912 (Tex. 1980); *In re Giles*, 657 P.2d 285, 286–87 (Utah 1982); *State v. J.S.*, 817 A.2d 53, 55–56 (Vt. 2002). One commonly cited

[2]We also note the parties in *M.T.* did not address mootness in their briefs.

collateral consequence of involuntary commitment is the accompanying stigma.[3]  *See, e.g., Joan K.*, 273 P.3d at 597–98; *Bradshaw*, 816 P.2d at 989; *Splett*, 572 N.E.2d at 885; *D.B.W.*, 616 P.2d at 1150–51; *Lodge*, 608 S.W.2d at 912; *J.S.*, 817 A.2d at 55–56.  The United States Supreme Court relied in part on the stigmatization of being labeled mentally ill in holding that a child has a liberty interest in not being confined unnecessarily.  *See Parham v. J.R.*, 442 U.S. 584, 601, 99 S. Ct. 2493, 2503, 61 L. Ed. 2d 101, 118 (1979).  The Court has also observed,

> [I]t is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual.  Whether we label this phenomena "stigma" or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual.

*Addington v. Texas*, 441 U.S. 418, 425–26, 99 S. Ct. 1804, 1809, 60 L. Ed. 2d 323, 330–31 (1979).

In *In re Guardianship of Hedin*, 528 N.W.2d 567, 574 (Iowa 1995), we recognized the existence of stigma in observing that one has a protected liberty interest in not being labeled mentally ill.  Many courts rely heavily on the stigma of mental illness in holding that a case involving an involuntary commitment is not moot simply because the person alleged to be mentally ill has been released from commitment.  *See, e.g., Joan K.*, 273 P.3d at 597–98; *Bradshaw*, 816 P.2d at 989; *Splett*, 572 N.E.2d at 885; *D.B.W.*, 616 P.2d at 1150–51; *Lodge*, 608

---

[3]We acknowledge that social stigma attaching to those with mental illnesses is unfairly prejudicial, but any potential unfairness does not eliminate the collateral consequences of an involuntary commitment.  *See State v. Van Tassel*, 484 P.2d 1117, 1122 (Or. Ct. App. 1971) (noting, in holding appeal not moot, that "[w]hether a society should view mental illness as carrying with it more stigma than any other form of illness, it, in fact, does").

S.W.2d at 912; *J.S.*, 817 A.2d at 55–56. *But see Westlake v. State*, 440 So. 2d 74, 75 (Fla. Dist. Ct. App. 1983) (holding that an appeal is moot despite stigma because courts look to legal consequences, not social consequences).

Another collateral consequence stemming from a finding that one is mentally ill is the potential to use one's involuntary commitment as evidence in future proceedings. In *Ballay*, the District of Columbia Circuit explained it this way:

> Indeed, such an adjudication, while not always crippling, is certainly always an ominous presence in any interaction between the individual and the legal system. Such evidence will frequently be revived to attack the capacity of a trial witness. Depending upon the diagnosis, it may be admissible for impeachment purposes. Indeed, even in a criminal trial it may be available to attack the character of a defendant if he has put character in issue. Most significantly, records of commitments to a mental institution will certainly be used in any subsequent proceedings for civil commitment, a factor which may well have been influential in the present case.

482 F.2d at 652. Other courts have made similar observations. *See, e.g., Joan K.*, 273 P.3d at 597; *In re Amey*, 40 A.3d 902, 909 (D.C. 2012); *In re Alfred H.H.*, 910 N.E.2d 74, 84 (Ill. 2009); *Hatley*, 231 S.E.2d at 634–35; *Giles*, 657 P.2d at 287; *see also Walter R.*, 850 A.2d at 349–50 (holding possibility of longer commitment period following adjudication of incompetence is a collateral consequence); *In re Webber*, 689 S.E.2d 468, 474 (N.C. Ct. App. 2009) (discussing an analogous situation involving defendants placed on probation).

Although persons adjudicated seriously mentally impaired suffer the foregoing collateral consequences,[4] Iowa Code chapter 229 preserves

---

[4]Courts have recognized other collateral consequences, such as restrictions on voting rights, jury service, the ability to obtain a driver's license, and adverse employment restrictions. *See In re Ballay*, 482 F.2d 648, 651–52 (D.C. Cir. 1973); *In re*

many legal rights the person previously enjoyed. Section 229.27(1) provides:

> Hospitalization of a person under this chapter, either voluntarily or involuntarily, does not constitute a finding of nor equate with nor raise a presumption of incompetency, nor cause the person so hospitalized to be deemed a person of unsound mind nor a person under legal disability for any purpose, including but not limited to any circumstances to which sections 6B.15, 447.7, section 488.603, subsection 6, paragraph "c", sections 488.704, 597.6, 600B.21, 614.8, 614.19, 614.22, 614.24, 614.27, and 633.244 are applicable.

Iowa Code § 229.27(1). The South Dakota Supreme Court relied on a similar provision in holding that an appeal of an involuntary commitment proceeding is moot once the person is released and the proceedings are terminated. *See In re Woodruff*, 567 N.W.2d 226, 228–29 (S.D. 1997). The court reasoned the provision demonstrated the legislature's intent to protect the legal rights of persons who were involuntarily committed and encompassed all collateral consequences alleged by the parties who had been adjudicated mentally ill. *Id.* at 228. The court went on to explain that the stigma resulting from involuntary commitment was not, by itself, sufficient to constitute a collateral consequence that would keep the controversy alive. *Id.* at 229.

We disagree with the South Dakota Supreme Court insofar as it suggests Iowa Code section 229.27(1) renders this action moot. The decision in *Woodruff* underestimates the stigma stemming from a finding that one is seriously mentally impaired. Such a finding has a "very significant impact on the individual." *Addington*, 441 U.S. at 426, 99 S. Ct. at 1809, 60 L. Ed. 2d at 331. We thus agree with the many

---

*Joan K.*, 273 P.3d 594, 597 (Alaska 2012); *In re Alfred H.H.*, 910 N.E.2d 74, 84 (Ill. 2009).

jurisdictions that find significant the stigma associated with a finding of serious mental impairment.

Some courts have considered the impact of prior involuntary commitments on the right of a person to appeal subsequent involuntary commitment. In *Joan K.*, the Alaska Supreme Court concluded that "there are sufficient general collateral consequences, without the need for a particularized showing, to apply the doctrine in an otherwise-moot appeal from a person's first involuntary commitment order." 273 P.3d at 598. Although the court agreed collateral consequences are presumed, it noted that "some number of prior involuntary commitment orders would likely eliminate the possibility of additional collateral consequences, precluding the doctrine's application." *Id.*

The Illinois Supreme Court took the opposite approach in *Alfred H.H.* The court held that the determination of potential collateral consequences for the purposes of mootness must be made on a case-by-case basis. *Alfred H.H.*, 910 N.E.2d at 84. Thus, in Illinois the person must present evidence sufficient to justify application of the collateral consequences exception.

We agree with the Alaska Supreme Court that the better approach is to presume that a person adjudicated seriously mentally impaired and involuntarily committed suffers adverse collateral consequences. Such an adjudication not only requires a finding that the person suffers a mental illness, but also that the person poses a danger to himself or others, is likely to inflict serious emotional injury upon another, or is unable to satisfy his own bodily needs for survival. The stigma arising from this adjudication is significant. In addition, the potential for the adjudication to be used in future proceedings is likely present in each case. Further, we recognize collateral consequences are mitigated if the

person has previously been involuntarily committed under chapter 229. For example, under federal law he or she will not lose the right to possess firearms because the right was already lost following the first commitment. *See* 18 U.S.C. § 922(d) (2006). Nonetheless, we believe prior involuntary commitments are better used as evidence to rebut the presumption of collateral consequences, rather than to deny the existence of collateral consequences. *See Joan K.*, 273 P.3d at 597.

We further agree with the Alaska Supreme Court that the presumption of collateral consequences may likely be rebutted by "some number of prior involuntary commitment orders." *Id.* at 598. For example, a series of recent, successive involuntary commitments that were either not appealed or upheld on appeal might effectively remove any stigma resulting from a later involuntary commitment proceeding. In this case, however, the record reveals that B.B.'s prior involuntary commitment occurred thirteen years ago. We do not think such a single and remote prior involuntary commitment is sufficient to eliminate the stigma resulting from the adjudication in this case. As a result, we now consider the merits of this appeal.[5]

**B. Sufficiency of the Evidence.** B.B. alleges the determination that he is seriously mentally impaired is not supported by substantial evidence. Iowa Code section 229.1 defines "seriously mentally impaired" in the following way:

> 17. "*Seriously mentally impaired*" or "*serious mental impairment*" describes the condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's

---

[5]As a result of our holding, it is not necessary for us to consider the application of the public interest exception to the mootness doctrine in this case.

hospitalization or treatment, and who because of that illness meets any of the following criteria:

*a.* Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.

*b.* Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.

*c.* Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.

Iowa Code § 229.1(17). In *In re Oseing,* 296 N.W.2d 797, 799 (Iowa 1980), we interpreted a previous incarnation of this definition as containing three elements. We stated that to find a person is seriously mentally impaired, that person must first be found to be "afflicted with a mental illness," and consequently "to lack sufficient judgment to make responsible decisions with respect to his or her hospitalization or treatment." *Oseing,* 296 N.W.2d at 799 (internal quotation marks omitted). Third, the person had to "be likely, if allowed to remain at liberty, to inflict physical injury on himself or others or to inflict emotional injury on the designated class of persons."[6] *Id.*

B.B. agrees sufficient evidence supports the finding that he has a mental illness, but challenges the sufficiency of the evidence as to whether he is unable to make responsible decisions about his own treatment, whether he would have caused serious physical injury to

---

[6]Subsequent to *Oseing,* the legislature amended the third element to provide that it could be satisfied if the person is "unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death." *See* 1995 Iowa Acts ch. 24, § 1; 1989 Iowa Acts ch. 275, § 1. However, because the district court did not make this finding, we will not consider it here.

himself or others, and whether he would have caused serious emotional injury to his family or others. We disagree with B.B.'s contentions.

In her report, Dr. Idahosa opined B.B. lacked sufficient judgment to make responsible decisions with respect to his hospitalization and treatment because of a mental illness. Dr. Idahosa also testified to the same at the hearing. Dr. Idahosa based her opinion on face-to-face examinations of B.B. that occurred every day after B.B. was hospitalized prior to the hearing. While Dr. Idahosa's opinion was short on specifics, we believe the district court reasonably relied on her opinion testimony.

Dr. Idahosa testified that B.B. claimed the hospital staff was attempting to take away his brain and other organs up until at least one day prior to the hearing, that he was irritable and violent towards hospital staff when he arrived at the hospital and thereafter, and that he refused to swallow his medication while hospitalized, prompting Dr. Idahosa to change his prescription to a medication that would dissolve under his tongue. In addition, in finding the element was satisfied, the district court observed that B.B. "can't even make the recognition that he has a mental illness, and that is where his problems begin." Thus, substantial evidence supports the district court's finding that B.B. lacked sufficient judgment to make responsible decisions about his medical treatment.

B.B. also argues substantial evidence does not support the finding that he would be likely to inflict serious physical injury on himself or others or that he would be likely to inflict serious emotional injury to members of his family or others lacking a reasonable opportunity to avoid him. In *Oseing*, we observed that the term "likely" means "probable or reasonably to be expected." *Oseing*, 296 N.W.2d at 801. We also stated that it "requires a predictive judgment, 'based on prior

manifestations but nevertheless ultimately grounded on future rather than past danger.' " *Id.* (citation omitted). In *In re Mohr*, we expanded on this definition by noting "[t]his element requires that the threat the patient poses to himself or others be evidenced by a 'recent overt act, attempt, or threat.' " 383 N.W.2d 539, 542 (Iowa 1986) (quoting *Stamus v. Leonhardt*, 414 F. Supp. 439, 451 (S.D. Iowa 1976)).

Dr. Idahosa opined B.B was likely to cause physical injury to himself or others. She based her opinion in part on the ground that B.B. is "irritable, he is paranoid, he feels people are trying to do something to him." Dr. Idahosa further stated, "He's always arguing with his wife, she has a restraining order and he has nowhere to go." That Dr. Idahosa based her opinion on the fact that B.B. was paranoid is significant because the district court could have found the diagnosis of "psychosis, not otherwise specified" to be directly connected to the finding that B.B. posed a likely threat to cause physical injury. *See* Iowa Code § 229.1(17) (requiring danger of physical harm to be caused by mental illness). Further, Dr. Idahosa observed that when B.B. went to the emergency room, "he displayed out of control behavior." Dr. Idahosa continued by saying that "[B.B.] was irritable [and] violent" and that B.B. "gets very angry if you don't do what he wants you to do and becomes threatening towards us." The December 14 emergency hospitalization order notes B.B. had been brought to the emergency room "in a very agitated and confused state" and was "making wild threats to harm himself and others and is currently requiring three police officers to keep him subdued." At the time of B.B.'s initial hospitalization, B.B.'s wife was afraid for him to come home and did not feel safe if he were to be released. She said the symptoms of paranoia were the worst she had seen in twelve years. The Hoffman affidavit noted that B.B.'s "wife fears

that he might harm her or their children if released." B.B.'s wife's fear of B.B. is illustrated by the fact that she obtained a restraining order against him. In light of this evidence, we conclude the district court committed no legal error in finding B.B. was likely to cause serious physical injury to himself or others if he remained at liberty. *See Mohr*, 383 N.W.2d at 542 (relying on the "threatening nature" of conduct).

## IV. Conclusion.

For the reasons expressed above, we hold that the matter is justiciable. On the merits, we conclude the district court's finding that B.B. was seriously mentally impaired is supported by substantial evidence.

## AFFIRMED.

All justices concur except Waterman and Mansfield, JJ., who concur in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I agree that if we reach the merits, the district court's order should be affirmed. However, I would dismiss the appeal as moot.

The majority seemingly holds that an appeal from a civil commitment order, where the appellant has been released, should only be dismissed as moot if there have been "a series of recent, successive involuntary commitments that were either not appealed or upheld on appeal." I think this standard opens the door to too many future appeals of commitment orders where nothing tangible is at stake. I am not in favor of using our judiciary's limited resources in this fashion.

This particular case highlights the potential concerns. Here B.B., a Nebraskan with a history of mental illness who admitted he was "distraught," crossed into Iowa on December 14, 2011, and tried to enter the restricted area of an Iowa Air National Guard base. He was brought to a hospital emergency room "in a very agitated and confused state." He was "making wild threats to harm himself and others and . . . requiring 3 police officers to keep him subdued." Based on an emergency order, B.B. was hospitalized. He refused to take his medication. He denied he had any mental illness or needed any medication. He claimed the hospital staff were going to take his brain or his organs from his body.

In addition to getting medical treatment in a Sioux City hospital, B.B. received a full hearing on December 20. After the hearing, the district court concluded that B.B. should remain hospitalized for the reasons set forth in Iowa Code section 229.1(17)(*a*) and (*b*). Seven days later, B.B.'s condition apparently stabilized. He was released for outpatient treatment and went home to Nebraska.

Now B.B. seeks to bring an appeal challenging the sufficiency of the evidence to sustain his expired commitment order. The taxpayers of Iowa will pay for all aspects of this appeal, including the expense of B.B.'s attorney, just as they bore the expense of all lower court proceedings.[7]

No one suggests that we are constitutionally required to hear this case. This is purely our call. As the majority notes, there is a grab bag of standards from other jurisdictions, under some of which this appeal would be moot. *See also In re Involuntary Commitment of Skelton*, 777 So. 2d 148, 149 (Ala. Civ. App. 2000) (dismissing appeal from commitment order as moot where the appellant had been released); *Dickinson v. State*, 270 S.W.3d 863, 866–67 (Ark. 2008) (dismissing appeal from commitment order where the appellant had been released and no public exception applied); *In re Doe*, No. 23869, 2003 WL 1264129 at *1–2 (Haw. Mar. 17, 2003) (same); *In re Interdiction of C.S.B.*, 880 So. 2d 997, 999 (La. Ct. App. 2004) (dismissing appeal as moot).

Furthermore, under *our own precedent*, this appeal is moot. In *In re M.T.*, we indicated that an appeal from a civil commitment order ordinarily becomes moot when the party has been released, stating, "We think the present appeal is moot. M.T. is no longer subject to the inpatient treatment order that resulted from the challenged hearing." 625 N.W.2d 702, 705 (Iowa 2001). True, what we said there was arguably dictum, because we later went on to hear the case under a separate exception to the ordinary rules of mootness. *Id.* But our court

---

[7]I mean no criticism of B.B.'s court-appointed counsel, who has been zealously and capably representing his client, as he should. My question is simply whether we should be voluntarily expanding our own appellate jurisdiction as urged by the majority.

unanimously signed on to the foregoing general statement on mootness, and it has been repeatedly followed by the court of appeals in dismissing appeals from commitment orders on mootness grounds.[8]

If we are going to overrule what we said in *In re M.T.*, then I would propose a different standard from the majority's. Thus, I would hold that a commitment appeal should automatically go forward if the appellant has not previously been adjudicated mentally ill (or the statutory equivalent) in any jurisdiction. If, however, the State can demonstrate that the appellant has previously been adjudicated mentally ill, e.g., in papers filed with a motion to dismiss the appeal, then the presumption would arise that the appeal is moot if the appellant has been released. The burden then would shift to the appellant to show that he or she will suffer some specific collateral consequence from the judgment that he or she seeks to appeal (other than the stigma or potential future evidentiary value of one more finding that the appellant is mentally ill). Alternatively, the appellant may show that the appeal falls into the broad public interest exception (and here I would hold that sufficiency of the evidence appeals do not meet that exception).[9] If the appellant fails to do either of these things, the appeal would be dismissed.

---

[8]*See In re J.R.L.*, No. 08–0298, 2008 WL 4307997 (Iowa Ct. App. Sept. 17, 2008); *In re J.P.*, No. 03–1419, 2004 WL 793223 (Iowa Ct. App. Apr. 14, 2004); *In re O.T.*, No. 03–0365, 2003 WL 22700659 (Iowa Ct. App. Nov. 17, 2003); *In re D.M.G., Sr.*, No. 02–0143, 2002 WL 31424828 (Iowa Ct. App. Oct. 30, 2002); *In re D.K.*, No. 00–1596, 2001 WL 1502825 (Iowa Ct. App. Nov. 28, 2001). Obviously, these kinds of cases will now be added to the court of appeals' caseload, as will the many appeals that were not previously brought because attorneys assumed they were moot (not to mention the appeals that we dismissed as moot on motion prior to any transfer).

[9]*See Rarey v. State*, 616 N.W.2d 531, 532 (Iowa 2000) (finding the public interest exception did not apply where the issues "relate[d] peculiarly to [the appellant's] particular situation"); *In re Alfred H.H.*, 910 N.E.2d 74, 81 (Ill. 2009) (noting that sufficiency of the evidence claims "are inherently case-specific reviews").

I believe this approach appropriately balances the interests of the appellant, the State, and the courts, and gives guidance for future cases. Under this approach, B.B.'s appeal would be dismissed. He has a prior involuntary commitment, even though it is from a number of years ago, and he has not shown that he will be subject to any specific collateral consequence because of his latest commitment order.

I recognize the potential exists for collateral consequences from any involuntary commitment order. I also acknowledge there can be stigma, although it bears emphasis that the proceedings are confidential. *See* Iowa Code § 229.24 (2011).[10] However, when a person already has a prior commitment order on his or her record, I think it is not unreasonable to insist that he or she demonstrate some concrete harm arising from the expired order he or she is trying to appeal. For the foregoing reasons, I respectfully dissent in part.

Waterman, J., joins this concurrence in part and dissent in part.

---

[10]The United States Supreme Court has recognized that "involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others . . . *can have* a very significant impact on the individual." *See Addington v. Texas*, 441 U.S. 418, 425–26, 99 S. Ct. 1804, 1809, 60 L. Ed. 2d 323, 331 (1979) (emphasis added). After first quoting this passage accurately, my colleagues then modify its meaning later in their opinion when they say that such a finding "*has* a 'very significant impact on the individual.' " (Emphasis added.)