# IN THE COURT OF APPEALS OF IOWA

No. 15-1621
Filed May 25, 2016

**IN THE MATTER OF J.K.,**
Appellant,

Alleged to be Seriously Mentally Impaired.

_____

Appeal from the Iowa District Court for Woodbury County, Edward A. Jacobson, Judge.

A nineteen-year-old woman appeals her civil commitment. **REVERSED.**

Zachary S. Hindman of Bikakis, Mayne, Arneson, Hindman & Hisey, Sioux City, for appellant.

Thomas J. Miller, Attorney General, and Gretchen Kraemer, Assistant Attorney General, for appellee State.

Considered by Tabor, P.J., and Bower and McDonald, JJ.

**TABOR, Presiding Judge.**

Nineteen-year-old J.K. appeals from the district court's order finding she was seriously mentally impaired. She contests the proof of her mental illness because she received several different diagnoses and challenges the evidence she was likely to inflict serious emotional injury on family members if she was not civilly committed. Because we find the order is not supported by clear and convincing evidence on the serious-emotional-injury element, we reverse.

## I.    Facts and Prior Proceedings

Considering information from her physician and family that J.K. was "becoming increasingly schizophrenic" and "exhibiting bizarre thinking," on July 21, 2015, a Woodbury county magistrate issued an emergency hospitalization order under Iowa Code section 229.22 (2015). The magistrate noted J.K. had "recently driven to Chicago and woke up in a hotel with no memory of having driven there."

The next day, J.K.'s mother, T.G.F., filed an application under section 229.6, alleging her nineteen-year-old daughter was suffering from serious mental impairment. T.G.F. alleged J.K. "has periods of incoherency." The application also alleged the teenager was living with "a 38-year-old man who is known for trafficking" and that she was "doing drugs, drinking, and prostituting." T.G.F. asserted her daughter suffered from posttraumatic stress disorder "so her decision-making skills are not working." The application also noted instances of J.K.'s "paranoia."

The district court appointed Dr. Josette Lindahl to conduct a personal examination of J.K. to determine if she met the criteria for serious mental

impairment in section 229.1(14). After an examination of J.K. on July 23, 2015, Dr. Lindahl reported that J.K. was mentally ill, stating her diagnosis as follows: "psychosis secondary to the use of synthetic drugs; psychosis nos, cannabis abuse vs. dependence, patient highly paranoid, suspicious, delusional." The doctor opined J.K. exhibited poor judgment and was easily manipulated.

On July 27, 2015, the court issued an order approving J.K.'s request for a second opinion at a clinic in Rochester, Minnesota, where her mother lived, and continuing the hospitalization hearing. A periodic report issued in late August 2015 indicated J.K. had failed to obtain the second mental-health opinion and had returned to Woodbury County. On September 1, 2015, J.K. obtained a second opinion from John Meyer, a therapist from the Dubuque Mental Health Center. His diagnosis was "Anxiety Disorder, NOS." In a letter to the court, he noted he "would have further sessions to diagnose her more accurately." J.K. received a third evaluation on September 10, 2015. Dr. Philip Muller agreed J.K. was mentally ill, but his diagnosis was antisocial personality disorder. He opined that because of her mental illness, she lacked sufficient judgment to make responsible decisions with respect to her hospitalization or treatment. As supporting facts, he noted "[patient] is involved in risky behavior, adult dancing, h[istory] of prostitution."

The district court held a contested commitment hearing on September 14, 2015. The court took judicial notice of the medical reports from Dr. Lindahl and Dr. Muller, as well as a letter drafted by T.G.F. detailing her concerns that J.K. was a victim of human trafficking. J.K. and T.G.F. both testified at the hearing. After reviewing the file, the court decided J.K. was (1) "afflicted with a mental

illness," (2) "lacks sufficient judgment to make responsible decisions with respect to her treatment or hospitalization," and (3) "is likely, if allowed to remain at liberty to . . . (b) inflict serious emotional injury on members of her family or others who lack reasonable opportunity to avoid contact with the respondent." The court made a specific finding that it found T.G.F.'s testimony to be credible. The court decided J.K. was "seriously mentally impaired" and ordered her to be placed at Associates for Psychiatric Services for further evaluation and outpatient treatment. The court also ordered J.K. to obtain a substance abuse evaluation.

J.K. appeals from the commitment order.

## II.     Standard of Review

In appeals from involuntary commitments, we review challenges to the sufficiency of proof for errors at law. *In re B.B.*, 826 N.W.2d 425, 428 (Iowa 2013). The State must prove the allegations of serious mental impairment by clear and convincing evidence. *Id.* Clear and convincing evidence is a less burdensome standard than proof beyond a reasonable doubt, but more burdensome than a preponderance of the evidence. *Id.* Clear and convincing means we find "no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.*

## III.     Serious Mental Impairment

J.K. argues the district court erred in finding she suffered from a "serious mental impairment." Iowa Code section 229.1(17) defines that phrase:

> "[S]erious mental impairment" describes the condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria:

a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.

b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.

c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.

The element of dangerousness—that is, the likelihood of a mentally ill person suffering or inflicting physical or emotional harm—is "constitutionally necessary" because the commitment statute allows confinement based on predicted behavior. *B.A.A. v. Chief Med. Officer*, 421 N.W.2d 118, 124 (Iowa 1988) (explaining dangerousness element creates a legitimate state interest in commitment). The term "likely" means "probable or reasonably to be expected." *In re Foster*, 426 N.W.2d 374, 378 (Iowa 1988). The likelihood that a mentally ill person will inflict injury requires proof of a recent overt act, attempt or threat. *Id.*

In this case, the district court found that because of her mental illness, J.K. lacked judgmental capacity and met the criteria under only subsection (b), requiring proof of emotional endangerment. *See* Iowa Code § 229.1(17)(b). J.K. challenges that finding on appeal, asserting the record did not contain clear and convincing evidence that she either (A) had a mental illness or (B) because of a mental illness was likely to inflict serious emotional injury on members of her family or others who lacked a reasonable opportunity to avoid her, had she been allowed to remain at liberty. *See id.* We will address each challenge in turn.

## A. Mental Illness

J.K. contests the proof of her mental illness because the three mental health professionals who evaluated her gave three different diagnoses. At the hearing, she testified:

> I've got three different opinions from three different people. I could go to six more people and get six more different opinions. It's just a guessing game. It's unfair for them to be playing the guessing game. And it's all based off of false information.

On appeal, her attorney makes the same point:

> [T]here is no way that any of the diagnoses amounts to clear and convincing evidence, because each is undermined by the other two. Importantly, the district court never made any ruling about the credibility of any of the three diagnoses. And the record does not reveal any reason to reject or to accept any one of the diagnoses in lieu of the other two. In other words, each competing diagnosis amounts to a serious or substantial doubt about the other two.

The State responds that one diagnosis by a physician is sufficient to support a finding of mental illness, and none of the mental health providers on record in this case attest that J.K. is not mentally ill. The State also points out the evaluations were conducted at different points in time. Notably, Dr. Lindahl diagnosed J.K. with psychosis not otherwise specified or psychosis secondary to the use of synthetic drugs in July 2015, when it was reasonable to believe J.K. was actively using those substances. Whereas, Dr. Muller diagnosed her nearly two months later, when the drugs may have left her system.

Section 229.1(10) defines "mental illness" as encompassing "every type of mental disease or mental disorder."[1] J.K. does not provide any authority that a

---

[1] The provision makes an exception for intellectual disabilities, and for insanity, diminished responsibility, and mental incompetency as those terms are defined in the criminal code or rules of criminal procedure. *See* Iowa Code § 229.1(10).

person is not mentally ill if she receives differing diagnoses of mental diseases or disorders. We find clear and convincing evidence in the record that J.K. is a person with a mental illness. *See In re B.J.C.*, No. 13-1916, 2015 WL 5970329, at *1 (Iowa Ct. App. Oct. 14, 2015) (noting respondent had "many different diagnoses over a course of time").

## B. Likelihood of Inflicting Serious Emotional Injury

J.K. next argues no evidence in the record supports the district court's finding that had she been allowed to remain at liberty, she would likely have inflicted serious emotional injury on members of her family or others who lacked a reasonable opportunity to avoid her. *See* Iowa Code § 229.1(17)(b).

"Serious emotional injury" is defined as:

> [A]n injury which does not necessarily exhibit any physical characteristics, but which can be recognized and diagnosed by a licensed physician or other mental health professional and which can be causally connected with the act or omission of a person who is, or is alleged to be, mentally ill.

*Id.* § 229.1(16).

As discussed above, the endangerment element requires the court to make a "predictive judgment, based on prior manifestations." *See In re J.P.*, 574 N.W.2d 340, 344 (Iowa 1998). But the element is grounded on future, rather than past, danger of serious emotional injury. *See id.* One commentator explained the central purpose of the emotional-injury standard is to "require an identification of those predictable consequences of mental illness, short of physical injury to others, but exclusive of injury to property, which justify rehabilitative state intervention." Randall Bezanson, *Involuntary Treatment of the*

*Mentally Ill in Iowa: The 1975 Legislation*, 61 Iowa L. Rev. 262, 290 (1975) [hereinafter Bezanson]. According to Professor Bezanson's analysis:

> The emotional-injury provision manifests a feeling that "physical injury" defines too narrow a category of behavior for purposes of enforced treatment, for often the most serious consequences of mental disorder are emotional. Accordingly, the statute provides that where truly serious emotional consequences result for family members or others who are not able to avoid them, enforced treatment may be ordered.

*Id.*

J.K. contends nothing in the record shows she "has ever done, or was ever likely to do, anything that could cause a diagnosable emotional injury in anyone, and in particular to anyone not reasonably able to avoid contact with her." J.K. argues her mother could choose to avoid contact with her, but her mother instead testified she goes out of her way to maintain contact with her daughter. J.K. further argues nothing in the record supports a finding that such harm would rise "to the level of severity necessary to satisfy the element of the section 229.1(17) definition of serious mental impairment."

In response to J.K.'s argument concerning the endangerment element, the State points to T.G.F.'s anguished testimony that her daughter has been isolated from her family by her much-older boyfriend, is a victim of human trafficking, and needs "trauma-based" therapy. T.G.F. wrote to the court that she was "a deeply concerned mother" and fears for her daughter's safety. The State urges: "This mom wants her daughter to stop prostituting herself, stop exotic dancing and stop using drugs. Her frequent correspondence with the court is an indication of the emotional toll this is taking on her."

We do not question T.G.F's credibility or her heart-felt concern for her daughter. And it is entirely understandable and commendable that T.G.F. desires to maintain contact with her troubled nineteen-year-old daughter. But the "emotional toll" described by the State resulting from that ongoing contact does not meet the standard of "serious emotional injury" that can be "recognized and diagnosed" by a mental health professional under the statute. *See J.P.*, 574 N.W.2d at 344 (reasoning that "emotional trauma" did not rise to the level of "serious emotional injury"). Neither does the State identify any recent overt acts by J.K. that signal she is likely to inflict serious emotional injury on family members or others who lack reasonable opportunity to avoid contact with her. *See* Bezanson, 61 Iowa L. Rev. at 295 ("Generalized predictions of emotional stress without accompanying manifestations drawn from the past should not suffice under the clear and convincing evidence standard."). Professor Bezanson further explained the legislative standard:

> Emotional injury is not precisely delineated, but it would include, for example, serious disruption of family relations leading to depression or nervous breakdown of family members, physical violence on the part of others, or medically diagnosable complications. In each case, however, the injury must be caused by the respondent as a result of his or her mental illness. . . . The injured party, whether a member of the respondent's family or not, must "lack reasonable opportunity to avoid contact with" the respondent. Thus, an individual's unreasonable self-subjection to the respondent and resulting emotional injury will not support a finding of emotional injury under the statute.

*Id.* at 302.

We conclude the State failed to offer clear and convincing evidence to satisfy the serious-emotional-injury prong of section 229.1(17)(b). Accordingly,

we reverse the district court's order declaring J.K. to be seriously mentally impaired.

**REVERSED.**