## IN THE COURT OF APPEALS OF IOWA

No. 16-0094
Filed June 15, 2016

**IN THE INTEREST OF N.L.,**
    Alleged to be seriously mentally impaired,

**N.L.,**
    Appellant.

_____

    Appeal from the Iowa District Court for Polk County, Rebecca Goodgame Ebinger, Judge.

    A man appeals his involuntary civil commitment. **REVERSED AND REMANDED.**

    Alexander D. Smith of Parrish, Kruidenier, Dunn, Boles, Gribble, Gentry, Brown & Bergman, L.L.P., Des Moines, for appellant.

    Thomas J. Miller, Attorney General, and Gretchen Kraemer, Assistant Attorney General, for appellee.

    Considered by Potterfield, P.J., and Mullins and McDonald, JJ.

**MCDONALD, Judge.**

A magistrate judge civilly committed N.L. for psychiatric evaluation and treatment pursuant to Iowa Code chapter 229 (2015). Three days later, the evaluating doctor filed a discharge report, concluding N.L. did not require full time hospitalization. Nonetheless, N.L. appealed the commitment order because of the collateral consequences related to a finding he was seriously mentally impaired within the meaning of chapter 229. *See In re B.B.*, 826 N.W.2d 425, 429 (Iowa 2013) (holding "that a party who has been adjudicated seriously mentally impaired and involuntarily committed is presumed to suffer collateral consequences justifying appellate review"). Following trial de novo,[1] the district court issued a hospitalization order placing N.L. at a medical facility for psychiatric evaluation and treatment on an outpatient basis. N.L. timely filed this appeal.

"An involuntary civil commitment proceeding is a special action that is triable to the court as an action at law." *In re B.T.G.*, 784 N.W.2d 792, 796 (Iowa Ct. App. 2010). Challenges to the sufficiency of the evidence in involuntary commitment proceedings are reviewed for correction of errors at law. *See* Iowa R. App. P. 6.907; *B.B.*, 826 N.W.2d at 428. The allegations in an application for

---

[1] There are significant differences between a "trial de novo" and a "de novo review." *See In re Huston*, 263 N.W.2d 697, 699 (Iowa 1978). Generally, in a "de novo review" proceeding, the reviewing court is restricted to the record made in the lower tribunal. *Sieg v. Civil Serv. Comm'n*, 342 N.W.2d 824, 828 (Iowa 1983); *Mason v. World War II Serv. Compensation Bd.*, 51 N.W.2d 432, 434 (Iowa 1952). On the other hand, "in a trial de novo, the court hearing the case anew is permitted to receive evidence additional to that presented" in the earlier hearing. *Dolan v. Civil Serv. Comm'n*, 634 N.W.2d 657, 662 (Iowa 2001); *see also Mason*, 51 N.W.2d at 434. Therefore, a statute providing for a "trial de novo" in the district court contemplates a trial in the general meaning of the term, not merely a review of the agency proceeding. *Dolan*, 634 N.W.2d at 662; *see also In re S.P.*, 719 N.W.2d 535, 536 (Iowa 2006).

involuntary commitment must be proved by clear and convincing evidence. *See In re J.P.*, 574 N.W.2d 340, 342 (Iowa 1998). For evidence to be clear and convincing "there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.*

To support an involuntary commitment under Iowa Code chapter 229, the applicant must prove by clear and convincing evidence the person is "seriously mentally impaired" or has a "serious mental impairment" as defined in section 229.1(20). That definition provides:

> "Seriously mentally impaired" or "serious mental impairment" describes the condition of a person with mental illness and because of that illness lacks sufficient judgment to make responsible decisions with respect to the person's hospitalization or treatment, and who because of that illness meets any of the following criteria:
> a. Is likely to physically injure the person's self or others if allowed to remain at liberty without treatment.
> b. Is likely to inflict serious emotional injury on members of the person's family or others who lack reasonable opportunity to avoid contact with the person with mental illness if the person with mental illness is allowed to remain at liberty without treatment.
> c. Is unable to satisfy the person's needs for nourishment, clothing, essential medical care, or shelter so that it is likely that the person will suffer physical injury, physical debilitation, or death.

N.L. challenges the sufficiency of the evidence supporting the second element—that because of his illness he lacked judgmental capacity regarding his hospitalization or treatment. This element "requires the State to prove that the person is unable, because of the alleged mental illness, to make a rational decision about treatment, whether the decision is to seek treatment or not." *Matter of Mohr*, 383 N.W.2d 539, 541 (Iowa 1986). In determining whether the person can make a rational decision, "the focus must be on whether the grounds for the decision are rational or reasonable not what conclusion is reached." *J.P.*,

574 N.W.2d at 343. "A decision, although medically inadvisable, may be rationally reached, and if so, it is not the court's place to second guess the decision." *Id.*

We conclude there is not substantial evidence supporting the finding N.L. lacked judgmental capacity regarding his hospitalization or treatment. In the discharge report, the evaluating and treating doctor diagnosed N.L. with major depressive disorder, recurrent. The doctor concluded N.L. was "capable of making responsible decisions with respect to his hospitalization or treatment." The doctor also stated N.L. "has improved with treatment, understands his mental disorders and accepts all treatment recommendations." The doctor concluded N.L. was treatable. At trial, the same doctor testified as follows:

> Q. All right. Doctor, once again, based upon your history and physical and upon a reasonable degree of certainty within your profession, as well as your own personal observations and laboratory studies, were you able to formulate an opinion as to whether or not [N.L.] is capable of making responsible decisions with respect to his hospitalization or treatment? A. As of his most recent evaluation done by me, which was two days ago, I think he's capable of making decisions.
> Q. All right. Let me ask you this, Doctor: If he has a recurrent condition and if he has a situation that we cannot predict, is it likely that in the future he would not have judgmental capacity? A. As I said, the likelihood of relapse or recurrence without treatment would be significant. The risk is mitigated if he is complying with treatment.

There was no medical testimony or other expert opinion to the contrary.

In reaching a contrary finding, the district court relied on the testimony of a social worker who met with N.L. on two occasions shortly prior to N.L. being evaluated pursuant to the magistrate's commitment order. The social worker testified N.L. made very specific threats to kill former coworkers and first

responders. The social worker testified he told N.L. that the social worker would have to report the threats N.L. made because the social worker was a mandatory reporter. N.L. responded by telling the social worker N.L. "regretted talking to [him] and that [N.L.] was going to lie moving forward whenever people asked him about these things."

The district court found the social worker's testimony that N.L. was going to lie moving forward undermined the doctor's opinion because the doctor was unaware N.L. might be lying at the time of the psychiatric evaluation. We disagree for three reasons. First, N.L. allegedly stated he was going to lie about making threats moving forward. However, it is clear from the doctor's discharge report and testimony that N.L. did not lie about making threats to others during the psychiatric evaluation. Second, N.L.'s alleged statement that he was going to lie about making threats does not imply that he could or would lie about his ability to make decisions regarding his treatment. Third, we credit the testimony of the doctor despite N.L.'s statement he would lie. The psychiatric doctor has expertise in diagnosing and treating mental illness. His opinion regarding N.L.'s condition was based on more information than the social worker's opinion, including the doctor's personal evaluation as well as information obtained from medical staff over a longer period of time. The doctor's evaluation of N.L. was more recent in time than the social worker's meetings with N.L. And finally, we place greater trust in the ability of the doctor and his medical staff to evaluate the veracity of the information provided during the evaluation process.

The district court had an additional reason for finding the applicant proved N.L. lacked judgmental capacity. First, the district court concluded N.L.'s case

was not moot because of potential collateral consequences related to N.L.'s ability to own or possess firearms. *See B.B.*, 826 N.W.2d at 429. Then, the district court concluded N.L.'s desire to appeal the commitment order to avoid the very collateral consequences making his case justiciable showed N.L. had "an inability to make responsible decisions with respect to his treatment" because he should not own or possess firearms. We can only conclude, "That's some catch, that Catch-22." Joseph Heller, *Catch-22* 46 (Simon & Schuster 2004) (1961).

Because the district court's finding that N.L. was seriously mentally impaired was not supported by substantial evidence, we reverse the decision of the court and remand for dismissal of the application.

**REVERSED AND REMANDED.**