

FILED

Jan 25 2019, 8:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amanda McIlwain
Legal Aid Corporation of
Tippecanoe County
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of M.M., A.M.,
and B.M. (Minor Children),

R.M. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

January 25, 2019

Court of Appeals Case No.
18A-JC-1234

Appeal from the Tippecanoe
Superior Court

The Honorable Faith A. Graham,
Judge

The Honorable Tricia L.
Thompson, Juvenile Magistrate

Trial Court Cause Nos.
79D03-1712-JC-301
79D03-1712-JC-302
79D03-1712-JC-303

**Mathias, Judge.**

[1] In an appeal from the Tippecanoe Superior Court, the parties present four issues, which we restate as:

(1) whether the Indiana Department of Child Services ("DCS") failed to prove that the coercive intervention of the court was necessary to provide the children with services;

(2) whether the record supports the services the court ordered Father to complete;

(3) whether the dismissal of the children in need of services ("CHINS") proceedings renders this appeal moot; and,

(4) whether the application Indiana Code Section 31-30-1-13 as revised allows a CHINS court to modify custody.

We reverse the CHINS adjudication. We also determine that the CHINS court could have properly considered the custody matter pursuant to the revisions to Ind. Code section 31-30-1-13. We further conclude that Father's challenge to the services ordered in the parental participation order is moot.

## Facts and Procedural History

M.M. was born on November 24, 2012. A.M. was born on July 1, 2014, and B.M. was born on December 30, 2015. A.K. ("Mother") and Father were not married at the time of the children's births; however, Father was present for all three births and is listed on each child's birth certificate. Father and Mother live approximately ten minutes' drive away from each other in Tippecanoe County. Prior to removal of the children from Mother's home, Father had trouble communicating with Mother and no regular parenting time schedule existed. However, Father regularly cared for the children on holidays and weekends.

Due to allegations of substance abuse in the home, Mother and her boyfriend entered into an Informal Adjustment ("IA") with DCS in June of 2017. The IA remained open until April 16, 2018, the date of the dispositional hearing in the CHINS matter. The assigned Family Case Manager ("FCM Rhodes") attempted to contact to Father during the IA. He initially did not respond but after some delay did make contact. Father later testified that he was at work during the hours that DCS was attempting to contact him. Father's home was not assessed during the IA, and he was not a party to the IA. Father also testified that he was not paying his child support because he believed any money given to Mother would be spent on drugs.

During an unannounced visit in the first week of November 2017, FCM Rhodes discovered child A.M. alone in Mother's home. Around Thanksgiving of 2017, Father informed FCM Rhodes that he had also found the children alone at Mother's home. On December 1, 2017, FCM Rhodes met with Father at his home. During this meeting, Father expressed further concerns regarding the well-being of the children while in Mother's care.

On December 3, 2017, Father called the police to request a well-being check on his children. When police arrived at Mother's home, the door had been broken down, the home was in disarray, and the children were in the home, all of them under the age of five, without an adult present. When Mother returned to her residence, she admitted to leaving the children home alone for fifteen to twenty minutes while she went to the store. Mother's boyfriend, who lived with Mother and the children, had broken down the door because he could not get

into the residence. Mother was arrested for neglect of a dependent. DCS filed a CHINS petition and removed the children, placing them with Father.

[7] The fact-finding hearing began on January 16, 2018, and, because evidence was not concluded on January 16, was continued to February 13, 2018. At the initiation of the fact-finding hearing, Father's attorney stated that, although they had not yet been filed, she had already drafted the documents "to restrict the Mother's access outside of a DCS case." Tr. p. 5. Father's counsel asked for a continuance of the fact-finding so that Mother could be served with the paperwork she had drafted and that the court could hear that matter at a later date. DCS did not object to the proposed continuance, but the court denied the request for a continuance stating, "[t]his is a case that was an Informal Adjustment, so this is not a case that has just begun. [Counsel for Father] you can present your evidence as to that and the Court may consider that the appropriate resolution, but we are going to go forward with the Fact Finding at this time." *Id.*

[8] At the time of fact finding, Father was employed and had arranged for the children to be at a licensed child care during the day. He obtained food stamps, health insurance for himself and the children, and was on the waiting list for vouchers to assist with day care costs. He was able to arrange all of this without the assistance of DCS. Father cared for the children without incident throughout the remainder of the case. He testified that he was concerned that Mother was still using drugs and had missed supervised visitation with the children. He felt like he should have full care of the children and that he could

care for them appropriately long term. Counsel for DCS raised concern that Mother still had legal custody of the children, and, absent the CHINS proceedings, the children legally could be returned to Mother's care.

[9] FCM Rhodes also testified that she had no issue with Children being in Father's care. She did testify that, based on the IA, as well as the incident leading to the removal of the children from Mother's home, she believed the coercive intervention of the court was necessary. Throughout the IA, a home-based caseworker was assisting with obtaining food from food pantries and helping Mother regain employment. Mother had been referred for a substance abuse assessment in June or July of 2017 through the IA and then again through the CHINS proceedings and had yet to complete it. Out of approximately twenty scheduled visits, she had completed three or four.

[10] The FCM recommended counseling for M.M. and First Steps programming for B.M. She also recommended a GLASS Evaluation, or a "a basic evaluation just to kind of go over developmental speech, different things like that, that can get them ready for Pre-K and Kindergarten." Tr. p. 103. She also testified that Father would be able to have the children complete such an evaluation without DCS involvement. *Id*. at 96.

[11] At the close of evidence on February 13, 2018, the court took the matter under advisement. The trial court signed its CHINS adjudication order on March 19, 2018, but the chronological case summary shows it was entered on March 23, 2018. At the dispositional hearing, held on April 16, 2018, the only service that

DCS felt "might be more appropriate" for Father was parenting education. *Id.* at 117–118. DCS no longer recommended case management for Father. DCS recommended case management, supervised visits, a parenting assessment, and drug screens for Mother. The court emphasized at the dispositional hearing that it wanted "to make sure that we get [Father] settled and on a good path" and entered a set of "standard orders" in its parental participation decree. *Id.* at 125, 128. By the time of the CHINS disposition, approximately ten months after services were offered at the initiation of the IA, and approximately five months after the same services were offered at the beginning of the CHINS proceeding, Mother had completed an initial clinical assessment. However, Mother had not responded to the therapist's attempts schedule follow-up appointments.

[12] Father obtained custody of the children in a separate proceeding on August 6, 2018. DCS then moved to dismiss wardship, which the court granted. Father then filed the instant appeal. Mother does not participate in this appeal.[1]

## Discussion and Decision

### I. CHINS Adjudication

[13] In order to adjudicate a child a CHINS, DCS must prove by a preponderance of the evidence that

> (1) the child's physical or mental condition is seriously impaired
> or seriously endangered as a result of the inability, refusal, or

---

[1] DCS filed a motion to remand this matter prior to filing its responsive brief. We have addressed the substance of the issues on appeal, and this motion to remand is denied.

neglect of the child's parent, guardian, or custodian, to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1; *In re S.A.*, 15 N.E.3d 602, 607 (Ind. Ct. App. 2014), aff'd on reh'g, 27 N.E.3d 287 (Ind. Ct. App. 2015), *trans. denied.* A CHINS adjudication focuses on the condition of a child, and whether that child needs services. *In re R.S.*, 987 N.E.2d 155, 159 (Ind. Ct. App. 2013). A CHINS adjudication may not be based solely on conditions that no longer exist. *Id.* The trial court should also consider the parents' situation at the time the case is heard by the court. *Id.* DCS has the burden of proving by a preponderance of the evidence that a child is a CHINS. Ind. Code § 31-34-12-3.

[14] In reviewing a CHINS determination, we do not reweigh evidence or assess witness credibility for ourselves. *In re S.A.*, 15 N.E. 3d at 607. We consider only the evidence in favor of the juvenile court's judgment, along with any reasonable inferences arising therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012).

Here, Father argues that DCS failed to prove by a preponderance of the evidence that the coercive intervention of the court was needed in order to provide the children with necessary services at the time of fact finding. DCS agrees that the coercive intervention of the court was not needed to provide services for the children while the children were in Father's care.

However, DCS points out on appeal that it continued to pursue a CHINS adjudication due to its statutorily defined duties and obligations to protect children "at imminent risk" of being displaced or endangered. *See e.g.* I.C. §§ 31-10-2-1 (State's child welfare policy and purpose), 31-9-2-17.8 (child services defined), 31-26-5-1 (child at imminent risk of placement), 31-33-8-1 (investigation/assessment of suspected child abuse or neglect), 31-34-1 (circumstances under which a child is a CHINS), *et. al.* In short, the agency's concern that led it to continue to pursue a CHINS adjudication in spite of its belief Father was a ready, willing, and able parent, was that he did not have actual legal custody, which meant the children were at risk for going back to an unfit mother if the CHINS cases were to be closed. It is DCS's position that the children were CHINS solely because of this legal risk, however remote in these circumstances, and that it is "compelled to pursue a CHINS adjudication unless and until the case can be resolved by other means, including legal custody to the non-offending parent." Appellee's Br. p. 28.

At the time of CHINS adjudication, the children had been placed in Father's care for almost four months without incident. He had appropriate living spaces and he had the children enrolled in a licensed day care while he went to work.

Father secured SNAP benefits, day care vouchers, and health insurance for himself and the children without the assistance of DCS services. He testified that he felt he was able to care for the children and intended to keep the children long term.

[18] In concluding that the children were CHINS, the trial court relied almost exclusively on the events that occurred during the IA and the events leading to removal of the children from Mother's home. In its order, the only reference to events or circumstances occurring after the removal refer to Mother's lack of participation in services throughout both the IA and the CHINS.

[19] The court's order adjudicating the children CHINS focuses on the facts and circumstances leading up to and surrounding the removal of the children from Mother's care, and not the situation at the time the case was heard. While DCS was concerned about the legal custody arrangement at issue, the legal possibility of the children returning to Mother's care does not alone mean that the children required services. The needs of the children were met, and there was no evidence showing that the coercive intervention of the court was needed to provide the children with services at the time of the fact-finding. Accordingly, we reverse the adjudication of the children as CHINS.

## II. Custody

[20] DCS argues that application of Indiana Code section 31-30-1-13, as amended by the General Assembly in 2017, resolves the tension between its belief that the children did not need services while in the care of the noncustodial parent, but,

absent the wardship, the custodial parent would be entitled to primary physical and legal custody and the children would be at risk of returning to unsafe conditions with their custodial parent. Indiana Code section 31-14-13-1 provides that "[a] biological mother of a child born out of wedlock has sole legal custody of the child, except as provided in Ind. Code § 16-37-2-2.1" absent additional legal action in accordance with Indiana Code sections 31-14-13-1, 2, and 2.3.

[21] Our court addressed this argument with respect to the previous version of Ind. Code section 31-14-13-1 in *In re J.B.*, 61 N.E.3d 308 (Ind. Ct. App 2016). In *J.B.*, we reversed a custody modification where the CHINS court modified custody to the unwed noncustodial parent and closed the CHINS case after only thirty days, without entering a dispositional decree and without giving mother a meaningful opportunity to participate in services. *Id.* At the time we decided *In re J.B.*, Indiana Code section 31-30-1-13(c) provided:

> (c)  If a juvenile court:
>
>> (1)  establishes or modifies paternity of a child; and
>>
>> (2)  terminates a child in need of services proceeding or a juvenile delinquency proceeding regarding the child;
>
> the court having concurrent original jurisdiction under subsection (a) shall assume or reassume primary jurisdiction of the case to address all other issues.

I.C. § 31-30-1-13(c) (2016); *see also In re J.B.*, 61 N.E.3d at 310. In the previous matter, DCS argued that when the legislature used the word "paternity" in subsection (c)(1), the legislature intended to include custody modifications as well. A panel of our court disagreed, in large part due to the legislature's omission of the word "custody," where it had included the word in other related statues. *In re J.B.*, 61 N.E.3d at 312.

[22] Our court also noted potential problems with competing jurisdiction if the statute were to be read to include custody modifications in the course of CHINS proceedings, stating, "if a CHINS court in one county does not approve a custody modification from a paternity court in another county and then modifies custody to a different parent, once the CHINS court terminates the CHINS proceeding, *both* orders would be in effect (with different parents receiving custody)." *Id.*

[23] In addition to jurisdictional issues, we also addressed policy concerns. We noted the policy of the state to "strengthen family life by assisting parents to fulfill their parental obligations" and "to provide a continuum of services developed in a cooperative effort by local governments and the state." *Id.* (citing *Ind. Code* § 31-10-2-1; *In re N.E.*, 919 N.E.2d 102, 108 (Ind. 2010)). We re-emphasized that "[i]t is clear that the policy and purpose of the CHINS statutory scheme is not to remove children from their parents without giving the parents a reasonable opportunity to participate." *Id*. at 313.

After *In re J.B.*, the legislature amended Ind. Code § 31-30-1-13. It presently reads,

> (a) Subject to subsection (b), a court having jurisdiction under IC 31-14 over establishment or modification of paternity, child custody, parenting time, or child support in a paternity proceeding has concurrent original jurisdiction with another juvenile court for the purpose of establishing or modifying paternity, custody, parenting time, or child support of a child who is under the jurisdiction of the other juvenile court because:
>
>> (1) the child is the subject of a child in need of services proceeding; or
>>
>> (2) the child is the subject of a juvenile delinquency proceeding that does not involve an act described under IC 31-37-1-2.
>
> (c) If, under this section, a juvenile court:
>
>> (1) establishes or modifies paternity, *custody, child support, or parenting time of a child*; and
>>
>> (2) terminates a child in need of services proceeding or a juvenile delinquency proceeding regarding the child;
>
> the order establishing or modifying paternity, custody, child support, or parenting time survives the termination of the child in need of services proceeding or the juvenile delinquency proceeding until the court having concurrent original jurisdiction under subsection (a) assumes or reassumes primary jurisdiction of the case to address all other issues.

I.C. § 31-30-1-13 (emphasis added). This modification to the statute in the wake of our decision in *J.B.* evidences a clear intent by the legislature for a CHINS court to be able to establish or modify custody, child support, or parenting time of a child over whom it exercises jurisdiction.

[25] Here, Father filed (in a separate proceeding) a Verified Petition to Affirm Paternity in which he requested full custody of the children on the day of the first fact-finding hearing. Mother was not present and had not been served with this petition. DCS, through counsel, acknowledged that the children did not need services when they were in the care of Father and that it would not consider the matter a CHINS but for Father's lack of legal custody. Accordingly, DCS did not object to a continuance of the fact-finding hearing to another date.[2]

[26] Mother had a meaningful opportunity to participate in the services that DCS made available to her throughout the IA. Services were again offered to Mother once the children had been removed from her home, and she again failed to participate. The record in this matter is not entirely clear as to reasons for the

---

[2] Indiana Code section 31-34-11-1(b) provides that a fact-finding hearing shall be completed "not more than sixty (60) days" after a petition alleging a child is a child in need of services is filed. The fact finding can be continued for an additional sixty (60) days if all parties consent. If a fact-finding hearing is not held, the case shall be dismissed without prejudice. *Id.* at § 1(d). Although CHINS courts are restricted in the ability to continue fact-finding hearings, here, DCS and Mother consented to Father's proposed continuance while the Court Appointed Special Advocate took no position. It was within the trial court's authority, as explained in this opinion, to continue the fact-finding hearing so that it could consider Father's request for custody modification along with the fact finding.

delay in hearing the custody matter as it was a part of a separate proceeding. However, provided Mother had notice and the opportunity to be heard regarding Father's request for change of custody, it was within the CHINS court's authority in accordance with the newly amended Ind. Code section 31-30-1-13 to consider the request for change of custody and enter an order modifying custody pursuant to the analysis required by Ind. Code section 31-14-13-2, as well as corresponding statutes and existing precedent, that would survive the termination of the CHINS proceeding.

## III. Parental Participation

[27] Father additionally argues that the record does not support the services the trial court ordered Father to complete. We have cautioned on more than one occasion that "[a]lthough the juvenile court has broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstance that was revealed by the evidence." *A.C. v. Marion Cty. Dep't of Child Svcs.*, 905 N.E.2d 456, 464 (Ind. Ct. App. 2009); *In re V.H.*, 967 N.E.2d 1066, 1073–74 (Ind. Ct. App. 2012). While many of the "standard orders" issued by the trial court in this case do not appear to be supported by the evidence, the CHINS petition has been dismissed by DCS, and the parental participation order is no longer in effect. As such, this particular issue is moot, *see In re Lawrence*, 579 N.E.2d 32, 37 (Ind. 1991) ("The long-standing rule in Indiana courts has been that a case is deemed

moot when no effective relief can be rendered to the parties before the court"),[3] and there is no relief that can be granted to Father on appeal.

## Conclusion

[28] Here, the trial court focused on the facts and circumstances at the time the CHINS petition was filed, not at the time of the disposition. As such, we reverse. Additionally, here, where Mother had a meaningful opportunity to participate in services and failed to do so, the purposes of the CHINS proceedings were met, and the trial court would have been within its authority to consider a custody modification. Lastly, Father's challenge to the trial court's orders concerning his participation is moot.

Vaidik, C.J., and Crone, J., concur.

---

[3] As a reversal of a CHINS adjudication can provide real relief to Father, the issue regarding adjudication of the CHINS is not moot on appeal. *In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014).