


FILED

May 05 2025, 11:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 25S-MH-111

## J.F.,
*Appellant*

–v–

## St. Vincent Hospital and Health Care Center, Inc. d/b/a St. Vincent Stress Center,
*Appellee*

Argued: November 19, 2024 | Decided: May 5, 2025

Appeal from the Marion Superior Court
No. 49D08-2303-MH-9936
The Honorable David Certo, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 23A-MH-752

**Opinion by Chief Justice Rush**

Justices Massa, Goff, and Molter concur.
Justice Slaughter concurs in part and in the judgment with separate opinion.

**Rush, Chief Justice.**

Courts have long recognized that temporary involuntary civil commitments—court orders confining people in facilities for mental health treatment—implicate a great public interest in both liberty and public safety. Yet although affected individuals have constitutional and statutory rights to appeal their temporary commitment orders, the commitments often expire while appeals are pending. Based on the guidance we provided nearly three years ago, our Court of Appeals has treated these appeals in inconsistent and disparate ways, often declining to review the merits by dismissing them as moot.

The discretionary framework we prescribed has proven inequitable and inefficient. Today we remedy these failings by taking a new approach. We recognize that temporary commitments—like criminal convictions and child-in-need-of-services judgments—implicate both substantial liberty interests and lifelong collateral consequences for the individuals involved, warranting an opportunity for appellate review on the merits. And we give meaning to the Legislature's specific guarantee of the right to appeal temporary commitment orders by holding that the order's expiration does not moot a timely appeal unless the appellee establishes the absence of any collateral consequences. We anticipate this ruling will refocus the bench and bar away from time-consuming disputes over the mootness of these appeals and back to the essential issues of liberty and public safety. We accordingly address this appeal on the merits and, finding the evidence sufficient to support the temporary commitment order, affirm.

## Facts and Procedural History

In January 2023, thirty-nine-year-old J.F. had been living with her parents for nearly nine years and was struggling with longstanding substance abuse issues. Her two children were living with their father and she had recently lost her job at a local automotive plant. Sadly, J.F. began to suffer from delusions and paranoia to the point she believed her parents wanted to kill her and her children. In late January, police took J.F. to a mental health facility where she stayed for seven days. After her

release, she lived first in her car and then in a motel until mid-February, when the police were called to the motel and she was admitted to the St. Vincent Stress Center. During her ten-day stay, she believed staff members were surveilling her through hidden cameras, slipping her medication, and saying things they hadn't said. The Stress Center sought a temporary involuntary civil commitment but had to release J.F. after a trial court denied the request.

Upon being released, J.F. lived out of her car, and her parents next saw her when she arrived outside their house in early March. They told J.F. she could sleep and shower inside, but she instead dropped her ID, keys, and phone and "walked off into the woods." Alarmed at this behavior, her parents called the police. Officers searched the area and found J.F. lying on a tarp in the woods about 150 yards from the house, where she claimed she was "camping." Though it was only twenty-nine degrees outside, J.F. had no coat or tent. The police took her to the St. Vincent emergency department, and the Stress Center admitted her for the second time in less than a month.

The Stress Center again sought a temporary commitment. At the hearing, J.F.'s psychiatrist, Dr. Erika Cornett, testified that J.F.'s lack of insight into her paranoid delusions impaired her ability to keep herself safe. The same judge who had presided over the February commitment hearing this time found by clear and convincing evidence that J.F. was gravely disabled by mental illness and commitment was appropriate. The court ordered a temporary commitment of up to ninety days.

J.F. appealed, challenging the sufficiency of the evidence to support her commitment. Though her case was not fully briefed before her commitment expired, she urged the Court of Appeals to reach the merits of her appeal and not to dismiss it as moot. The Stress Center declined to take a position on mootness. Yet the Court of Appeals dismissed J.F.'s appeal as moot, declining to apply the public interest exception to mootness because the appeal didn't "address a novel issue, present a close call, or provide an opportunity to develop case law on a complicated topic." *J.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 222 N.E.3d 1020, 1024–25 (Ind. Ct. App. 2023). The panel also concluded J.F. hadn't

presented a "particularized harmful consequence" stemming from her commitment to justify finding her appeal was not moot. *Id.* at 1024.

J.F. petitioned for transfer, which we now grant, thus vacating the Court of Appeals' opinion. Ind. Appellate Rule 58(A).

# Discussion and Decision

Civil commitment proceedings have two purposes: "to protect the public and to ensure the rights of the person whose liberty is at stake." *T.K. v. Dep't of Veterans Affs.*, 27 N.E.3d 271, 273 (Ind. 2015) (quotation omitted). These purposes are effectuated by statute. *See* Ind. Code art. 12-26. For involuntary temporary commitments, which are at the heart of this appeal, a trial court can commit a person to an appropriate facility for up to ninety days if they are mentally ill and either dangerous or gravely disabled. I.C. §§ 12-26-6-1, -8(a). But before being committed, the person has the right to receive copies of petitions or orders relating to them, be represented by counsel, receive adequate notice of a hearing, and be present at the hearing. *Id.* § -2-2(b). And the court can only order a temporary commitment if, after a timely hearing, it finds by clear and convincing evidence that the person is mentally ill and either dangerous or gravely disabled and that committing them is appropriate. *Id.* §§ -2-5(e), -5-11(a), -6-8(a). If the trial court orders a temporary commitment, the committed person has both constitutional and statutory rights to appeal that decision. Ind. Const. art. 7, § 6; I.C. § 12-26-1-9.

But by the time most appeals are briefed, the person's temporary commitment will have expired. When this happens, the appeal may become moot, which occurs when the appellate court cannot provide either party with effective relief. *T.W. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 121 N.E.3d 1039, 1042 (Ind. 2019). Until recently, our Court of Appeals consistently reached "the merits of appeals from expired temporary civil commitment orders" by applying the public interest exception to mootness. *E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 188 N.E.3d 464, 465 (Ind. 2022) (per curiam). This exception "may be invoked when the issue involves a question of great public importance which is

likely to recur." *Id.* at 466 (quoting *In re Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991)).

In 2019, we first applied this exception in the temporary commitment context to determine whether a court-appointed commissioner had the authority to enter two commitment orders. *T.W.*, 121 N.E.3d at 1042. Because we decided that issue under the public interest exception, we did not address the appellants' arguments that "potentially harmful collateral consequences"—the ongoing adverse effects commitments have on the lives and rights of affected individuals—prevented their appeals from becoming moot. *Id.* at 1042, 1044 n.5. Three years later, we clarified in *E.F.* that *T.W.* did not "signal that appellate courts should rarely address the merits of appeals from expired temporary commitment orders." *E.F.*, 188 N.E.3d at 466. Instead, we explained that temporary commitment appeals often fit within the public interest exception "because they are transitory in nature and require the delicate balancing of a person's fundamental liberty interest with the safety of individuals and the public." *Id.* at 465. But we held that the exception "should be applied on a case-by-case basis," thus giving our Court of Appeals ample discretion. *Id.*

Following this guidance, different panels of our Court of Appeals have naturally taken varied approaches when resolving mootness issues in temporary commitment appeals. As detailed below, some panels have required the appellant to demonstrate great public importance in the precise issues they raise or to show particular collateral consequences in their own lives, while other panels have not. These inconsistent results, while understandable, have resulted in untenable inequity and inefficiency. We do not fault the Court of Appeals for these flaws: they stem from the case-by-case direction we provided in *E.F.* and the fact that, until today, we have not addressed the effect of collateral consequences that flow from expired temporary commitment orders. Ultimately, the burdens of litigating mootness issues have ballooned, overshadowing the merits of these cases.

We can do better. Today we hold that temporary commitment appeals—similar to appeals in criminal and child-in-need-of-services (CHINS) cases—are not moot as long as our appellate courts can provide

effective relief from the manifold collateral consequences of invalid commitments. In so holding, we give effect to the Legislature's guarantee of the right to appeal temporary commitment orders and ensure individuals will generally obtain merits review of the court-ordered deprivation of their liberty. We first explain in greater detail why we have decided to guarantee merits review for almost all timely temporary commitment appeals. We then address the merits of J.F.'s appeal and, finding the evidence sufficient to support the commitment order, affirm.

## I. A timely appeal of a temporary civil commitment seldom becomes moot when the commitment ends.

We begin by explaining the need to reconsider our current approach to mootness in the context of timely temporary commitment appeals. We then chart a sounder approach considering both the serious collateral consequences temporary commitment orders engender and individuals' constitutional and statutory rights to appeal them.

### A. The discretionary mootness framework we prescribed in *E.F.* has resulted in inefficiencies and disparate results.

For nearly twenty years before *E.F.*, our appellate courts routinely decided the merits of appeals involving expired temporary commitment orders under the public interest exception to mootness. *E.F.*, 188 N.E.3d at 467 (collecting cases); *In re Commitment of J.B.*, 766 N.E.2d 795, 798–99 (Ind. Ct. App. 2002). Then, in 2022, we explained that we did not "disapprove of such practice" and instructed our Court of Appeals to exercise its discretion in determining whether to apply the exception. *E.F.*, 188 N.E.3d at 467. In the nearly three years since, the Court of Appeals has issued over thirty published and memorandum decisions addressing mootness.

Those decisions have generally fallen into one of three categories. The first category includes opinions determining whether to apply the public interest exception. Some panels have freely invoked it based on the general importance of temporary commitment cases, *see, e.g., E.F. v. St.*

*Vincent Hosp. & Health Care Ctr., Inc.*, 194 N.E.3d 1130, 1135 (Ind. Ct. App. 2022), while others have declined to apply the exception and dismissed appeals that didn't present particularly novel, close, or complicated issues, *see, e.g.*, *J.G. v. Cmty. Health Network, Inc.*, 209 N.E.3d 1206, 1210–11 (Ind. Ct. App. 2023). In the second category are opinions based on collateral consequences that flow to the individual from their involuntary commitment. Some panels have addressed the merits of these cases due to the general possibility of collateral consequences, *see, e.g.*, *B.E. v. St. Vincent Stress Ctr.*, No. 24A-MH-413, at *2 n.1 (Ind. Ct. App. Aug. 22, 2024) (mem.), while others have addressed the merits based on evidence of collateral consequences specific to the individual, *see, e.g.*, *C.P. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 219 N.E.3d 142, 149 (Ind. Ct. App. 2023). But some panels, including the one here, have dismissed appeals as moot given the person's failure to demonstrate a "particularized" collateral consequence. *J.F.*, 222 N.E.3d at 1024; *see also, e.g.*, *M.C. v. Sandra Eskenazi Mental Health Ctr.*, No. 24A-MH-1364, at *3 (Ind. Ct. App. Feb. 28, 2025) (mem.), *trans. pending*. Finally, the third catchall category includes opinions in which panels have either declined to address mootness, *A.N. v. Cmty. Health Network, Inc.*, No. 23A-MH-1658, at *1 (Ind. Ct. App. Nov. 8, 2023) (mem.), or reached the merits because the appellee failed to argue mootness, *see, e.g.*, *K.K. v. Cmty. Health Network, Inc.*, 215 N.E.3d 382, 384 n.1 (Ind. Ct. App. 2023), *trans. denied*.

These varied approaches are not surprising in light of our guidance in *E.F.* But the inconsistent results are untenable for two primary reasons.

Though every temporarily committed person has both constitutional and statutory rights to appeal their commitment order, Ind. Const. art. 7, § 6; I.C. § 12-26-1-9, this right has been diluted for those individuals whose appeals are dismissed as moot. We recognized this concern just last summer, noting that temporary commitment appeals are "frequently dismissed as moot, leaving affected individuals without the opportunity for meaningful appellate relief." Order Establishing the Marion County Expedited Mental Health Appeals Pilot Project, No. 24S-MS-190 (Ind. July 16, 2024) ("Order Establishing Pilot Project"); *see also* Jonathan B. Warner, *Collateral Consequences and the Right to Appeal: Reconsidering Whether Temporary Commitment Appeals in Indiana are Moot*, 15 Ind. Health L. Rev.

295, 302–03 (2018) (arguing that allowing mootness to potentially insulate "an entire class of trial court judgments" raises serious constitutional concerns). And, as shown above, a temporarily committed individual's access to meaningful review has become dependent on the three-judge panel randomly assigned to decide the appeal. *Cf. In re Adoption of C.B.M.*, 992 N.E.2d 687, 693 (Ind. 2013) (recognizing the importance of providing a party with "a meaningful appellate remedy"). Such justice by lottery runs counter to our recognition that "Hoosiers consider the right to an appeal one of the tools indispensable to meaningful participation in the judicial process." *Campbell v. Criterion Grp.*, 605 N.E.2d 150, 158 (Ind. 1992). A system in which that tool is meaningful to some but illusory to others is inequitable.

The inconsistent resolution of these appeals has also bred inefficiency by requiring attorneys and judges to routinely spend substantial resources litigating and deciding mootness issues. To zealously advocate for their clients, appellate attorneys must address both the public interest exception to mootness and the collateral consequences flowing from the order. And, in some cases, our Court of Appeals has issued entire opinions adjudicating only these issues. *See, e.g.*, *M.H. v. Sandra Eskenazi Mental Health Ctr.*, No. 23A-MH-1100, at *2–4 (Ind. Ct. App. Dec. 7, 2023) (mem.) (dedicating over 1,000 words to finding the appeal moot in a memorandum decision). It is especially inefficient for a panel to explain why an appeal isn't a close case, thereby addressing the merits without resolving them. *See J.G.*, 209 N.E.3d at 1210–11 (summarizing the "ample" evidence supporting commitment). We conclude it would be far more efficient for attorneys and judges to prioritize developing the law to ensure the dual purposes of civil commitment proceedings are fulfilled rather than undertaking mootness inquiries which, for reasons provided below, will only rarely lead to dismissing these appeals as moot.

All in all, the need for greater equity and efficiency convinces us we must reconsider the framework for reviewing timely temporary commitment appeals. What's more, our consideration of the collateral consequences that flow from temporary commitments persuades us that these cases generally deserve appellate review on the merits.

## B. Timely temporary commitment appeals generally warrant merits review.

We have never addressed how mootness is affected by the potentially harmful collateral consequences that arise from a temporary commitment order. In *E.F.*, we recognized that we had previously "left open the possibility that respondents . . . could seek relief from any collateral consequences caused by" invalid temporary commitment orders. 188 N.E.3d at 466 (citing *T.W.*, 121 N.E.3d at 1044 n.5). But we declined to consider whether collateral consequences preserved the appeal from mootness altogether. Today, however, we widen our view and entertain that question.

Collateral consequences that flow from legal proceedings can impose "onerous, long-lasting burdens on an individual." *State v. Reinhart*, 112 N.E.3d 705, 713 (Ind. 2018). Indeed, our courts have often relied on collateral consequences in holding that "appeals are not moot where meaningful relief may still be had" upon review. *C.P.*, 219 N.E.3d at 147–49 (collecting cases). Two particularly consequential classes of appeals—criminal and CHINS—are routinely not moot due to collateral consequences.

It is well-settled that "a criminal conviction remains a live controversy, even after the sentence is served, because it often leads to collateral consequences." *In re Marriage of Stariha*, 509 N.E.2d 1117, 1123 (Ind. Ct. App. 1987); *see also Sibron v. New York*, 392 U.S. 40, 57 (1968) (recognizing that criminal convictions are reviewable unless there is "no possibility that any collateral legal consequences" will follow); *Smith v. State*, 971 N.E.2d 86, 89 (Ind. 2012) (addressing the revocation of a community corrections placement even after the defendant had served his sentence because a future court could have used the violation as a statutory sentencing aggravator). Similarly, we have held that a CHINS finding did not become moot when a child was returned to their parent's care because the finding could "relax the State's burden for terminating parental rights" and result in "adverse job consequences." *In re S.D.*, 2 N.E.3d 1283, 1290 (Ind. 2014). Thus, reviewing a closed CHINS case can still afford "meaningful relief by lifting those collateral burdens." *Id.; see also, e.g., In re N.C.*, 72 N.E.3d 519,

524 (Ind. Ct. App. 2017); *In re M.M*, 118 N.E.3d 70, 78 n.3 (Ind. Ct. App. 2019). The same is true for temporary commitment appeals, as the commitment order—if invalid and left undisturbed—carries with it potentially harmful collateral consequences.

We begin with mandatory collateral consequences imposed by statutes. A person who has been involuntarily "committed to a mental institution" may not carry a handgun. I.C. § 35-47-2-1.5(a)(3), (b)(7)(C). Violating this prohibition can be a Class A misdemeanor or Level 5 felony. *Id.* § -1.5(e). Additionally, the person's information must be transmitted for inclusion in the FBI's National Instant Criminal Background Check System, which firearms dealers often must query before transferring a firearm. *Id.* § 12-26-6-8(f); 18 U.S.C. § 922(t)(1). Federal firearms restrictions sweep even more broadly. A person who has been committed may not, among other things, "receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(4). A knowing violation risks up to fifteen years' imprisonment. *Id.* § 924(a)(8). Finally, a temporary commitment remains on an individual's mental health record, which can be disclosed—without their consent—in certain circumstances. I.C. §§ 16-39-2-6, -3-3.

On top of these statutory consequences, a temporary commitment can make a future commitment more likely. Indeed, "a 'history of mental illness requiring hospitalizations' may be probative of whether a person is 'gravely disabled and should be involuntarily committed.'" *M.T. v. Cmty. Health Network*, 219 N.E.3d 151, 155 (Ind. Ct. App. 2023) (quoting *Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind. Ct. App. 2004), *trans. denied*). This possibility has been so widely recognized that we find it need not be established by particularized evidence in each case. *See, e.g., In re Ballay*, 482 F.2d 648, 652 & n.15 (D.C. Cir. 1973); *In re Giles*, 657 P.2d 285, 286–87 (Utah 1982); *In re B.B.*, 826 N.W.2d 425, 431 (Iowa 2013); Warner, *supra*, at 301. There are also "serious stigma and adverse social consequences" that can accompany an involuntary temporary commitment. *T.K.*, 27 N.E.3d at 273; *see also Addington v. Texas*, 441 U.S. 418, 425–26 (1979) (labeling this fallout "indisputable").

Finally, other collateral consequences can flow from an individual's temporary commitment, including lasting effects on marital relationships, family dynamics, employment opportunities, and housing. *See A.B. v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 240 N.E.3d 166, 169 (Ind. Ct. App. 2024) (potentially affecting technical certification); *N.H. v. Cmty. Health Network, Inc.*, No. 24A-MH-713, at *3 (Ind. Ct. App. Dec. 19, 2024) (mem.) (potentially affecting child custody); *cf. In re T.S.*, 881 N.E.2d 1110, 1113–14 (Ind. Ct. App. 2008) (regular commitment leading to a CHINS finding). While these effects vary based on each person's circumstances, they bolster the conclusion that temporary commitment orders often significantly disrupt people's lives even after they expire.

Simply put, just like criminal convictions and CHINS findings, temporary commitment orders, if invalid and left undisturbed, carry with them potentially harmful collateral consequences. And though individuals might not be able to point to particularized harms at the time of appeal, justice requires a meaningful opportunity to seek relief from commonplace collateral consequences that will otherwise "remain to plague" them. *In re Hatley*, 231 S.E.2d 633, 634 (N.C. 1977). When such consequences are a "fact of life," their "mere possibility" is "sufficiently substantial" to render an appeal not moot. *Sibron*, 392 U.S. at 55 (quotations omitted). And so, by reviewing the merits of temporary commitment appeals, our appellate courts can almost always provide meaningful relief. We thus hold that timely appeals of temporary commitment orders generally do not become moot when the orders expire. But that is not to say there might not be an exceptional case that won't carry the potential for any collateral consequences. *See B.B.*, 826 N.W.2d at 432 (suggesting that "a series of recent, successive involuntary commitments that were either not appealed or upheld on appeal might effectively remove any stigma resulting from a later involuntary commitment proceeding"). It will be the appellee's burden to make that extraordinary showing. *Cf. West Virginia v. EPA*, 597 U.S. 697, 719 (2022).

This holding gives effect to our Legislature's decision to guarantee committed individuals a statutory right to appeal in Section 12-26-1-9, which makes no exception for temporary commitments even though they usually expire before the appeal process runs its course. It also reflects our

preference to "decide cases on their merits rather than dismissing them on procedural grounds." *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). And it aligns us with many of our sister courts that review the merits of all, or presumptively all, expired temporary commitment appeals. *See, e.g.*, *Hatley*, 231 S.E.2d at 634–35; *State v. Lodge*, 608 S.W.2d 910, 912 (Tex. 1980); *Giles*, 657 P.2d at 286–87; *B.B.*, 826 N.W.2d at 431–32; *In re J.S.W.*, 303 P.3d 741, 744 (Mont. 2013); *In re F.C.*, 97 N.E.3d 333, 334–35 (Mass. 2018); *In re Naomi B.*, 435 P.3d 918, 927–29 (Alaska 2019).

Additionally, our holding will ensure that individuals whose commitment issues are capable of repetition in their own future cases will have access to meaningful review. *See Washington v. Harper*, 494 U.S. 210, 218–19 (1990) (holding that a mentally ill prisoner's involuntary medication issue wasn't moot where his history made it likely officials would seek to medicate him again); *J.S.W.*, 303 P.3d at 744 (noting that commitment issues aren't moot when they are capable of repetition, yet otherwise evade review); *In re N.L.*, 71 N.E.3d 476, 479 (Mass. 2017) (describing the commitment and treatment of mentally ill people as classic examples of issues that are capable of repetition, yet evade review). While we have never adopted the federal "capable of repetition yet evading review" doctrine, *see In re Lawrance*, 579 N.E.2d 32, 37 n.2 (Ind. 1991), and do not do so today, we simply recognize that our holding resolves this problem in the temporary commitment context.

We anticipate that today's decision will enable the bench and bar to focus productively on developing Indiana's mental health law and protecting individual rights and public safety—rather than unnecessarily expending time and effort on discretionary mootness inquiries. We also acknowledge the ongoing work of those involved in a pilot project to evaluate whether, by using advanced transcription technology and accelerated briefing schedules, our courts can complete the commitment review process within ninety days. *See* Order Establishing Pilot Project. Though today's decision largely dispenses with the mootness analysis in temporary commitment appeals, the pilot project retains vital importance for individuals in our most populous county whose appeals are decided while they are still confined. *See, e.g.*, *G.D. v. St. Vincent Hosp. & Health*

*Care Ctr., Inc.*, No. 24A-MH-2242, at *1–2 & n.1 (Ind. Ct. App. Oct. 23, 2024) (mem.) (expedited appeal decided in forty days), *trans. denied*.

Because the expiration of a temporary commitment order does not render a timely appeal moot unless the appellee establishes there are no collateral consequences, our appellate courts will rarely need to apply *E.F.*'s discretionary approach to the public interest exception in commitment appeals. And here, because the Stress Center does not contest the collateral consequences, we accept J.F.'s request to consider the merits of her appeal.

## II. Sufficient evidence supported J.F.'s temporary commitment.

J.F. challenges the sufficiency of the evidence to support her commitment, asserting there wasn't clear and convincing evidence that she was gravely disabled. The Stress Center, by contrast, insists that clear and convincing evidence proved J.F.'s "deterioration left her unable to function independently, and put her—and her children—in danger of coming to harm." We agree and conclude there was sufficient probative evidence for the trial court to find that J.F. was gravely disabled.

Statute sets forth the standards for committing an individual. A petitioner seeking a temporary commitment must prove by "clear and convincing evidence" both that the individual "is mentally ill and either dangerous or gravely disabled" and that commitment "is appropriate." I.C. § 12-26-2-5(e). Relevant here, "gravely disabled" means:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> > (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
> >
> > (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning,

or behavior that results in the individual's inability to function independently.

*Id.* § -7-2-96.

On sufficiency review, we will affirm a civil commitment order if—considering only the probative evidence and reasonable inferences favorable to the judgment—a reasonable factfinder could have found the necessary statutory elements proven by clear and convincing evidence. *T.K.*, 27 N.E.3d at 273. In conducting this review, we will not reweigh the evidence or reassess witnesses' credibility. *Id.*

Here, the trial court was presented with ample evidence that J.F.'s reasoning was substantially impaired. She was suffering from active paranoid delusions. For example, she believed that somebody "like a ghost writer" had typed death threats on her phone, her father had drugged her, and hospital staff were using hidden surveillance cameras and changing the clocks. Dr. Cornett diagnosed J.F. with an unspecified psychotic disorder as well as opiate and cannabis use disorders.

There was also evidence J.F. couldn't function independently and would consequently endanger herself. When police officers found J.F. lying on a tarp in freezing temperatures without necessary clothing or equipment, she told them she was "camping." And Dr. Cornett testified that J.F.'s lack of insight into her paranoia impaired "her ability to make safe decisions for herself." She also feared J.F.'s cycle of hospitalizations would continue if she were not committed. Granted, J.F. tried to explain her concerning behavior to the trial court. But the judge—who had found J.F.'s testimony coherent at the February hearing—concluded at the end of the March hearing that the "features of mental illness" were now "obvious." Sufficient evidence thus established that J.F. was gravely disabled. *See E.F.*, 194 N.E.3d at 1138 (affirming where a psychiatrist testified that the individual possessed minimal insight into her diagnosis and risked coming to harm).

We address an additional aspect of J.F.'s sufficiency argument. She contends some of the evidence the trial court heard wasn't probative because it concerned her past condition, not her condition at the time of

the March hearing. She concedes, however, that an individual's prior conduct may have a nexus to their current condition. Evidence established that nexus here. J.F.'s father testified that J.F. lost her job in January after suffering from delusions that some of her coworkers were part of a "crime family" who had hacked her phone and tried to run her over in a parking lot. He then described how he and J.F.'s mother found J.F. hiding in the house and begging them not to kill her. And he recounted how, the day after that incident, he and J.F.'s mother found J.F. hiding with her two children in the bathroom, yelling and pleading not to kill them. Though this evidence of J.F.'s condition in January wasn't current, it still had a nexus to her condition at the time of the March hearing. It showed the course of J.F.'s deterioration, helped ensure she was not committed based on one isolated incident, and demonstrated the pattern of delusions and behavior Dr. Cornett anticipated would continue if J.F. were not temporarily committed. This evidence could therefore reinforce the court's decision.

For these reasons, we conclude that sufficient evidence supported the trial court's judgment.

## Conclusion

Because the Stress Center did not show J.F.'s temporary commitment carried no collateral consequences, J.F.'s timely appeal did not become moot when her underlying commitment expired. But because sufficient evidence supported the temporary commitment order, we affirm.[1]

Massa, Goff, and Molter, JJ. concur.
Slaughter, J., concurs in part and in the judgment with separate opinion.

---

[1] We thank amici—the American Civil Liberties Union and the ACLU of Indiana, Community Health Network and Indiana University Health, Eskenazi Health, the Indiana Public Defender Council, and Kent Hull—for their helpful briefs. We also thank Community Health Network and Indiana University Health for participating in oral argument.

ATTORNEYS FOR APPELLANT J.F.

Joel M. Schumm

Indianapolis, Indiana

Talisha R. Griffin

Marion County Public Defender Agency

Indianapolis, Indiana

ATTORNEYS FOR APPELLEE ST. VINCENT HOSPITAL AND
HEALTH CARE CENTER, INC.

Andrew B. Howk

Matthew M. Schappa

Hall, Render, Killian, Heath & Lyman, P.C.

Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE AMERICAN CIVIL LIBERTIES
UNION AND AMERICAN CIVIL LIBERTIES UNION OF INDIANA

Kenneth J. Falk

American Civil Liberties Union of Indiana

Indianapolis, Indiana

Matthew R. Segal

American Civil Liberties Union

Boston, Massachusetts

ATTORNEYS FOR AMICI CURIAE COMMUNITY HEALTH
NETWORK, INC. AND INDIANA UNIVERSITY HEALTH, INC.

Jenny R. Buchheit

Sean T. Dewey

Abby V. DeMare

Ice Miller LLP

Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE ESKENAZI HEALTH

Bryan H. Babb

Seema Shah

Bose McKinney & Evans LLP

Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE INDIANA PUBLIC DEFENDER
COUNCIL
Bernice Corley
Suzy St. John
Indiana Public Defender Council
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE KENT HULL
Kent Hull
South Bend, Indiana

**Slaughter, J., concurring in part and in the judgment.**

I agree with the Court that this case is not moot. J.F. plausibly claims that her involuntary civil commitment, though expired, is likely to subject her to adverse collateral consequences in the future. Thus, the fact that she has now been released from her temporary commitment does not preclude us from reaching the merits of her appellate claim. On the merits, I agree that she gets no relief because sufficient evidence supports her commitment.

I write separately on two matters. First, the Court repeats, in *dicta,* its embrace of our "public interest" exception to mootness, which should have no place in our constitutional scheme. The only mootness standard consistent with our state constitution's separation-of-powers mandate requires an actual, ongoing controversy between adverse parties. Second, the Court shifts the burden of proving mootness from the committed person to her custodian—with which I take no issue. But reassigning the burden between parties does not relieve us of our independent duty to ensure the matter before us remains a live, justiciable controversy.

A

Our mootness doctrine derives from constitutional limits on judicial power. See Ind. Const. art. 3, § 1. We may decide only actual disputes between adverse parties through binding decrees that afford meaningful relief to the prevailing party. *Hill v. State*, 592 N.E.2d 1229, 1230 (Ind. 1992). Courts decide only actual, ongoing disputes to "ensure that the judiciary retains its proper role within our constitutional order and leaves the political branches undisturbed, absent a legal wrong." *Seo v. State*, 148 N.E.3d 952, 970 (Ind. 2020) (Slaughter, J., dissenting). If a case is moot, we cannot decide it. *Hill*, 592 N.E.2d at 1230.

Consistent with separation of powers, the Court today holds that an appeal from an expired commitment is not moot "as long as our appellate courts can provide effective relief from the manifold collateral consequences of invalid commitments." *Ante*, at 5–6. I agree and have said much the same thing: A civil-commitment appeal is not moot when "specific adverse consequences arising from the commitment are likely to affect the patient in the future". *E.F. v. St. Vincent Hosp. and Health Care Ctr.*, 188 N.E.3d 464, 468 (Ind. 2022) (Slaughter, J., dissenting). But in

pronouncing this rule, which is constitutionally sound, the Court continues to embrace a "public interest" exception to mootness, *ante*, at 13, which is not sound. This exception is too broad and cannot be squared with the judiciary's limited role under separation of powers. *E.F.*, 188 N.E.3d at 468 (Slaughter, J., dissenting); *Seo*, 148 N.E.3d at 969 (Slaughter, J., dissenting).

Mootness is akin to standing; both doctrines ensure that courts decide only actual disputes, whereby a favorable judgment provides an aggrieved claimant with meaningful redress. As for standing, a party must "establish standing at each stage of litigation" because it is "an essential element of a claimant's case". *Hoosier Contractors, LLC v. Gardner*, 212 N.E.3d 1234, 1238 (Ind. 2023). Yet our treatment of moot claims is not so exacting. Unlike with standing, our mootness inquiry does not insist on an ongoing, litigant-specific injury. Even if a specific plaintiff's claim is unquestionably moot, our public-interest exception allows us to reach the merits "if someone—anyone—may face the same issue in the future." *Seo*, 148 N.E.3d at 970 (Slaughter, J., dissenting). This exception fails to ensure a case is "suitable for adjudication under our constitution." *Ibid*. The public-interest exception cannot be squared with our constitution's limits on judicial power.

In lieu of our public-interest exception, we should adopt a "capable-of-repetition" exception to mootness. Under this standard, a court must avoid an otherwise moot matter "unless it is capable of repetition, yet evading review." *Id.* at 969 (Slaughter, J., dissenting). Only this standard is consistent with article 3, section 1. This standard provides that "an actual dispute remains" only if an appeal "present[s] a question likely to recur between the same parties in circumstances that will likely skirt judicial review." *Id.* at 970 (Slaughter, J., dissenting). Just as the "same parties" test governs issues of standing, so too should it govern issues of mootness.

## B

Second, I have no quarrel with the Court's decision to shift to the custodian the burden of proving the case is not moot, *i.e.*, that no collateral consequences flow from the committed person's challenged detention. *Ante*, at 11. But shifting this burden in these cases does not relieve appellate courts of our own duty to ensure the appeal before us remains a live controversy. We must ensure, in other words, that "the claimant

continues to have a personal stake in the outcome throughout the lawsuit." *Seo*, 148 N.E.3d at 970 (Slaughter, J., dissenting). After all, "[a] court decree issued after a case has become moot is merely an advisory opinion, providing no meaningful relief to the prevailing party." *E.F.*, 188 N.E.3d at 468 (Slaughter, J., dissenting). It remains a core tenet of separation of powers that "courts should not issue advisory opinions but instead should decide cases only on the specific facts of the particular case and not on hypothetical situations." *Snyder v. King*, 958 N.E.2d 764, 786 (Ind. 2011).

\* \* \*

For these reasons, I concur in part and in the Court's judgment that J.F.'s commitment is not moot and is supported by sufficient evidence. But I join neither the Court's embrace of the public-interest exception to mootness, nor the Court's implication that an appellate court is somehow relieved of its independent duty to insist that appeals from expired civil commitments remain live, justiciable controversies.